# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>ex rel. DR. BRENT GEAR, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 00 C 1046 |
| v. | ) ) ) | Judge Norgle |
| EMERGENCY MEDICAL ASSOCIATES<br>OF ILLINOIS, INC., and ILLINOIS/<br>INDIANA EM-1 MEDICAL SERVICES,<br>S.C. | ) ) ) ) | **DOCKETED**<br>DEC 1 1 2003 |
| Defendants. | ) | |

**FILED**

DEC 1 0 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## SECOND AMENDED COMPLAINT

### INTRODUCTION

Plaintiff, the United States of America, by BRENT GEAR, D.O., as the Relator, brings this action under the False Claims Act, as amended, 31 U.S.C. §3729 et seq., and under the common law, and alleges as follows:

1.    This is an action by Brent Gear, D.O. (Doctor of Osteopathy), on behalf of the United States, to recover penalties and damages arising from a massive, fraudulent billing scheme in which the Defendants willfully and deliberately overcharged the United States Government ("Government") for hospital emergency room examinations and treatment provided to Medicare patients by student doctors ("Residents") enrolled in Defendant Midwestern University's ("Midwestern") graduate medical education ("GME") residency program. Since at least June, 1997, Defendants Emergency Medical Associates of Illinois, Inc. and Illinois/Indiana EM-1 Medical Services, (collectively, "EmCare") have fraudulently billed the Government for services of Residents who were acting within the scope of their GME program, obtaining residency credit and being paid by Midwestern pursuant to their Resident Contracts, but who



were at the same time serving, and being billed by EmCare as unsupervised attending physicians ("Attending Physicians") at various EmCare-staffed hospitals in the Chicago area, all in clear violation of the federal regulations governing payment of Residents for work relating to their GME programs.

2.     This allegations of misconduct in this Complaint are based upon non-public information the Relator obtained through his personal observations while he was employed by Midwestern and EmCare in certain of the Chicago area hospital emergency rooms staffed by EmCare.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over this action pursuant to 31 U.S.C. §3732(a) and (b) because it is an action brought under 31 U.S.C. §3730.

4.     Venue is proper in this district pursuant to 31 U.S.C. 3732(a) because Defendants all transact business in this district and committed a number of acts proscribed by 31 U.S.C. §3729 in this district.

## PARTIES

5.     Plaintiff, Brent Gear, D.O., the Relator in this qui tam action, was a resident of the City of Chicago in the State of Illinois at all times pertinent to this Complaint.  He currently resides in Mesa, Arizona.  Dr. Gear is a licensed emergency physician and a year 2000 graduate of Midwestern's emergency medicine residency program, pursuant to which he worked in the emergency rooms of St. Bernard Hospital, Grant Hospital and Edgewater Hospital, three of the Chicago area hospital emergency rooms staffed by EmCare. By virtue of his experience as a Midwestern Resident and his work as a physician in these emergency rooms, Dr. Gear has acquired direct personal knowledge of non-public information relating to Defendants' fraudulent conduct alleged herein.

6.     Defendants Emergency Medical Associates of Illinois, Inc. and Illinois/Indiana EM-I Medical Services, S.C (collectively, "EmCare") are Illinois corporations doing business in Cook County, Illinois.  Defendants are engaged in the business of providing emergency medical staffing and administrative services to various Chicago area hospitals, including Bethany Hospital, Grant Hospital, Edgewater Hospital, Provident Hospital, St. Margaret Hospital, Olympia Fields Osteopathic Hospital & Medical Center and Trinity Hospital.  As part of their Midwestern GME program, Midwestern Residents have provided medical services at each of the

3

aforementioned hospitals. At all times relevant to this lawsuit, EmCare separately contracted with senior Midwestern Residents to provide Attending Physician services. A representative sample employment contract is attached hereto as Exhibit A.

7.     Midwestern University, not presently a Defendant, is an Illinois corporation which at all relevant times offered a GME residency training program in osteopathic medicine to Dr. Gear and others, and which placed its Residents at various EmCare-staffed hospitals in the Chicago area, including the hospitals listed in paragraph 6 of this Complaint. Midwestern and EmCare have affiliated with each other and various of those hospitals to carry out the educational and service goals of Midwestern's residency program; a representative sample of one such affiliation agreement is attached hereto as Exhibit B.

8.     Pursuant to contract, EmCare entities staff emergency rooms in 365 U.S. hospitals and employ 4,500 doctors and clinicians. In 1998, EmCare entities recorded six million patient visits; their 1999 revenues totaled $475 million.

## FACTUAL BACKGROUND

9.     One of the functions of the United States Department of Health and Human Services ("HHS"), through the Health Care Financing Administration ("HCFA"), is to administer the Supplementary Medical Insurance Program for the Aged and Disabled established by Part B, Title XVIII, of the Social Security Act, 42 U.S.C. §1395j et seq. ("Medicare"). Medicare is a federal health insurance program that serves certain disabled people, as well as people age 65 or older.

10.     In the State of Illinois, the federal Medicare program is administered through a private insurance contractor (the "carrier"), as authorized by 42 U.S.C. §1395u. The Medicare claims procedure in Illinois is as follows:   the carrier reviews claims for reimbursement

4

submitted by Medicare providers and, after verifying the patient's Medicare coverage, pays those claims according to the applicable Medicare reimbursement schedule. All such payments are one hundred percent (100%) federally funded.

11.    Medicare reimburses providers such as EmCare and hospitals for the medical services of licensed physicians in two ways. First, Medicare Part A funds hospitals that care for Medicare patients. Second, Medicare Part B pays physicians who provide "identifiable personal" care for Medicare patients.

12.    In addition, Medicare separately reimburses the costs of approved GME programs such as the program offered by Midwestern as outlined in 42 C.F.R. §413.86 and other regulations cited therein. Such reimbursable costs include Residents' salaries and fringe benefits. According to Defendants (See page 2 of Defendants' Memorandum in Support of Motion to Dismiss Amended Complaint in the Adams case), "Midwestern bills each hospital for providing a resident-in-training in the emergency department, and each hospital in turn bills Medicare for reimbursement of the hospital's expense for providing this training (which includes Midwestern's charges for providing training to the resident in the hospital's emergency department.) The hospital pays Midwestern the charges Midwestern invoices for providing a resident-in-training to the hospital emergency department."

13.    .In order to seek reimbursement under these regulations, the residency program must be approved by one of a number of selected organizations, including the American Osteopathic Association ("AOA"). The AOA's criteria for approved programs, among other things, places extreme importance on adequate training and supervision of student doctors by more experienced certified emergency physicians. Indeed, the approval standards promulgated by the AOA emphasize that "[e]ducation, not service, is the primary purpose of a residency

5

program." Only approved GME programs may properly obtain Medicare reimbursement for Residents' salaries and other costs incident to the residency program.

14.     EmCare staffs hospital emergency rooms (including the hospitals listed in paragraph 6 above) with attending physicians ("Attending Physicians") and clinicians. Attending Physicians are licensed physicians who have successfully completed their residency requirements. Under the specific circumstances outlined in 42 C.F.R. §415.208, Residents who are senior enough to have obtained a state medical license (available in Illinois after two years of post-graduate work) and who are working outside the scope of their residency programs (referred to in the Medicare regulations as "moonlighting") may also serve as Attending Physicians.

15.     In accordance with their hospital contracts as well as Medicare regulations, EmCare is required to have at least one Attending Physician physically present in each of its emergency rooms at all times. In order to obtain reimbursement from Medicare for the services of an Attending Physician, the billing paperwork must include the Attending Physician's individual provider number. Unlicensed Residents cannot properly obtain Attending Physician provider numbers.

16.     Residents ("Residents") are medical school graduates who gain required experience in their field of practice through an apprenticeship program, known as a "residency." Dr. Gear participated in Midwestern's emergency medicine residency program from 1997 until 2000. In order to graduate from that program, Residents like Dr. Gear were required to work a minimum of 18 supervised shifts per month in the EmCare-staffed emergency rooms that participated in Midwestern's residency program. "Supervised" shifts were those in which

Residents diagnosed and treated patients under the direct, physical supervision of an Attending Physician for credit toward completion of their residency program.

17.     Pursuant to their Resident Contracts, a representative sample of which is attached hereto as Exhibit C, Dr. Gear and the other Residents in Midwestern's residency program were paid a set salary by Midwestern for the work they performed within the scope of their residency program; that salary remained constant regardless of the number of shifts they worked each month. Dr. Gear earned between $29,000 and $33,000 annually in salary during his residency

18.     Payment by Medicare for services of Attending Physicians in teaching hospitals such as those EmCare-staffed facilities that participated in the Midwestern residency program is set forth in 42 C.F.R. §§415.162, 415.170 and other related regulations cited therein. Payment of "moonlighting" Residents working as Attending Physicians outside the scope of their residency programs is outlined in 42 C.F.R. §415.208.

19.     Although Residents may serve – and be billed – as Attending Physicians under the specific conditions outlined in paragraph 17 hereof, 42 C.F.R. §415.200 provides that: "Services furnished in hospitals by residents in approved GME programs are specifically excluded from being paid as "physician services" defined in § 414.2 of this chapter and are payable as hospital services. This exclusion applies whether or not the resident is licensed to practice under the laws of the State in which he or she performs the service. The payment methodology for services of residents in hospitals and hospital-based providers is set forth in § 413.86 of this chapter." (emphasis added)." In addition, 42 C.F.R. §415.208(b)(1) reiterates that "The services of residents to inpatients of hospitals in which the residents have their approved GME program are not covered as physician services and are payable under § 413.86 regarding direct GME payments" except in the narrow circumstances set forth in subpart (b) (2) of that

Section for "[s]ervices of residents that are <u>not related to their approved GME programs</u>." (emphasis added) Thus, there is no circumstance under which the services of unsupervised Residents working within the scope of their GME program may properly be billed to Medicare as separate physician services (apart from what Medicare pays pursuant to Section 413 to offset costs of the residency program).

<u>**FRAUDULENT BILLING PRACTICES**</u>

20.    Since at least the beginning of Dr. Gear's residency in June, 1997, if not substantially earlier, Defendants and Midwestern have collaborated to reduce the costs of emergency room physicians and increase their respective profits by fraudulently double-billing Medicare for the services of senior Residents in Midwestern's residency program.

21.    This fraudulent scheme took the form of a program-wide arrangement (presented, at least in Dr. Gear's case, as a mandatory "opportunity" for Residents to make extra money beyond their Residency salaries) pursuant to which after the Residents obtained their state medical licenses and Medicare Attending Physician provider numbers. Under this arrangement, Residents were required to work some or all of their required 18 monthly shifts on an unsupervised basis in the capacity of Attending Physicians at various EmCare hospitals, rather than in the capacity of properly supervised Residents. As with their properly supervised shifts, the work performed by these senior Residents consisted of examining, diagnosing and treating emergency room patients. As with their properly supervised shifts, Residents received credit toward their graduation requirements for all such Attending Physician shifts (up to 18 total shifts per month).

22.    Senior Residents were advised, however, that if they agreed to sign separate employment contracts with EmCare (which Dr. Gear and every classmate of whom he was aware

8

did), they could be paid extra for all shifts worked in the capacity of Attending Physician. The contract stipend varied from hospital to hospital (as reflected in the appendixes to Exhibit A hereto), but all such money was in addition to the monthly salary the Residents continued to receive for their participation in Midwestern's residency program. Dr. Gear received $100 per 12-hour shift for all of his Attending Physician work.

23.     On several occasions beginning the end of his second-postgraduate year and continuing during his third post-graduate year, Dr. Gear questioned Dr. Douglas Webster (a physician, a principal of EmCare and a Midwestern professor) and Dr. Steve Roskam (a physician and residency director for the Midwestern GME program), about the propriety of this Attending Physician arrangement, and expressed his reluctance to participate. In response, Dr. Webster, among other things, said that this was just the way the residency was run and that the rate had previously been just $50 per shift, but had had to be raised to meet minimum wage requirements. Dr. Roskam's response was to suggest, among other things, that if Dr. Gear did not participate regardless of his reservations, he might not get a favorable letter of recommendation upon completion of his residency.

24.     In accordance with this program, licensed Midwestern Residents, beginning their third post-graduate year, were routinely assigned to work for residency credit as unsupervised Attending Physicians in EmCare-staffed hospitals. For example, attached as Exhibit D are the EmCare emergency room schedules for Bethany, Edgewater, Grant, OFOM, Provident, St. Bernard, St. Margaret and Trinity Hospitals for December, 1999, January, 2000, and February, 2000, which identify as Attending Physicians the following individuals who, as set forth on the medical school student listing attached hereto as Exhibit E, were senior Residents working for residency credit: Wayne Baker, Lisa Ting, Mar Jesser, John Pacini, Paul Oland, Tam Van Thai,

Minh Pham, Jeanine Walters, Brent Gear, Stephen Outters, Theresa Mums, Carl Piel, Keith Butvilas, Thomas Rosier, Kevin Brown, and Aranganee Bowers. See also the personal work schedule of Dr. Gear, attached hereto as Exhibit F, prepared by EmCare, which classifies him for some shifts as "R," for Resident, and for other shifts as "A," for Attending Physician.

25.    Throughout his residency, Dr. Gear and his fellow Residents continued to be paid their regular Resident salary (which, in Dr. Gear's case came to $29,000 to $33,000 per year) by Midwestern. Dr. Gear and his fellow senior Residents, including, without limitation, those listed in paragraph 24 above) were also separately compensated for their overlapping "Attending Physician" shifts pursuant to their respective employee contracts with EmCare.

26.    In connection with his work as an Attending Physician, Dr. Gear was required to sign patient charts, such as those attached hereto as Exhibit G, as the Attending Physician. He understood that the purpose of having him sign in that capacity was to bill for his services as an Attending Physician. Indeed, the only purpose served by listing Residents as Attending Physicians and requiring them to work unsupervised is to obtain separate Medicare reimbursement for their services, as Medicare does not otherwise reimburse hospitals for patient care provided by Residents beyond the funds provided pursuant to 42 C.F.R §413.86 to offset the costs of the residency program. Moreover, Defendants have admitted (at pages 2 and 3 of their Memorandum of Law in Support of Defendants' Motions to Dismiss Amended Complaint in Adams et al. vs. EmCare Holdings, Inc. et al., Case No. 03 CH 01044 currently pending in the Circuit Court of Cook County ("Defs' Adams Brief" ) that they employed Residents as Attending Physicians and that EmCare (through EM-1) "bills Medicare (as well as other insurance companies) for the attending physician [sic] usual and customary service charges that professional medical service corporations bill insurance agencies and Medicare."

27.     On the basis of those matters set forth in paragraph 26 hereof, Dr. Gear alleges on information and belief that beginning as early as 1977 and continuing until at least June 2000, Defendants billed Medicare for the services of all Midwestern Residents who worked as Attending Physicians in the Chicago area hospital emergency rooms staffed by EmCare. By this lawsuit, Plaintiff seeks recovery solely in connection with the Attending Physician work performed by Residents as part of their required 18 shifts and for which they obtained residency credit, as opposed to any additional Attending Physician work he or other Residents or other physicians may have performed outside of the scope of an approved GME residency program.

28.     Throughout the course of his residency, Dr. Gear and his fellow Residents were also paid a salary by Midwestern for the services rendered by them in the course of their residency program, including their required 18 monthly shifts (regardless of whether or not those 18 shifts were supervised or not, and regardless of whether or not the Residents were simultaneously serving as Attending Physicians).

29.     Under this arrangement, Midwestern was able to obtain reimbursement from Medicare for the costs of its residency program, including the salaries paid to the Residents for the medical services they provided as Residents, despite the fact that much of such unsupervised work was not properly part of the approved graduate medical residency program for which Federal funding was available. In addition, Midwestern was able to cut its costs for supervisory personnel. By this scheme, EmCare was able to bill and collect from Medicare a second time – and at substantially higher rates -- for those same services and at the same time lower its emergency room costs, all at Medicare's expense (as well as at the expense of the Residents, who, in addition to remaining underpaid and overworked, were denied the training and supervision to which they were entitled as part of their residency program).

11

30.     EmCare is aware of the misconduct described in this Complaint, and, in fact, are the architects of these fraudulent practices. Specifically, EmCare at all relevant times knew that Medicare will not reimburse EmCare for medical services provided by Residents as part of their approved GME program. Through its professional and/or its administrative employees, EmCare knowingly and intentionally misclassified Residents as Attending Physicians, and billed Medicare for those Residents' unsupervised medical services, with the express purpose of obtaining reimbursement in excess of that permitted for such medical services.

## COUNT I

### False Claims Act – Unsupervised Resident Examinations

31.     Plaintiff repeats and realleges each allegation in paragraphs 1 through 30 as if fully set forth herein.

32.     This is a <u>qui tam</u> civil action brought by Brent Gear, D.O. and the Government of the United States to recover treble damages and civil penalties under 31 U.S.C. §3729(a)(1) of the False Claims Act.

33.     EmCare has violated 31 U.S.C. §3729(a) in that for at least 3 years, from June, 1997 through 2000, they have repeatedly, willfully and intentionally:

    (a)     submitted false and/or fraudulent claims for payment to an officer
            or employee of the U.S. Government in connection with unsupervised
            patient diagnosis, examination and/or treatment by Midwestern Residents
            related to their GME residency program; and

    (b)     made, used or caused to be made or used, false records or
            statements to get false or fraudulent claims for such examinations paid by
            the U.S. Government.

34.     In reliance on these false claims, the U.S. Government, by and through its local Medicare Intermediaries, has overpaid EmCare.

12

35.    As a result of EmCare's violations of 31 U.S.C. §3729(a), the U.S. Government has been damaged in an amount in excess of ONE MILLION DOLLARS ($1,000,000), exclusive of interest.

36.    Dr. Gear is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to 31 U.S.C. §3730(b) on behalf of himself and the United States.

WHEREFORE, Brent Gear and the United States pray for entry of judgment in their favor and against EmCare and for damages as follows:

To the U.S. GOVERNMENT:

a)    three times the amount of actual damages sustained by the U.S. Government as a result of the Defendants' fraudulent practices;

b)    a civil penalty of not less than $5,000 and not more than $10,000 for each false claim submitted by each Defendant to the U.S. Government;

c)    prejudgment interest; and

d)    all costs of this action.

To the Relator:

a)    30% of the proceeds of this action, pursuant to 31 U.S.C. §3730(d);

b)    reimbursement of the expenses incurred by the Relator in connection with this action;

c)    an award of reasonable attorneys' fees;

d)    the costs and disbursements of this action; and

e)    such other relief as this Court deems just.

## COUNT II

### Unjust Enrichment

37.     Plaintiff repeats and realleges each allegation in paragraph 1 through 36 above as if fully set forth herein.

38.     This is a civil action brought by the plaintiff, Brent Gear, D.O. and the government of the United States to recover from EmCare the amount by which they have been unjustly enriched.

39.     Defendants are not entitled to the Medicare and other Government payments obtained through the improper billings referred to above, and have been unjustly enriched to the extent of such payments.

40.     By reason of the foregoing, the U.S. Government has been damaged in the amount of no less than several million dollars.

WHEREFORE, the plaintiff, Brent Gear, D.O. and the United States pray for entry of judgment in their favor and against the Defendants in an amount equal to the Medicare and other Government payments unjustly obtained by Defendants, plus interest, costs, and such other relief as may be appropriate and just.

Respectfully submitted,

_____
Janet L. Reed
One of the Attorneys for Plaintiff

Terrence Buehler
Janet L. Reed
Robert E. Williams
BUEHLER REED & WILLIAMS

19 South LaSalle Street
Suite 1500
Chicago, Illinois 60603
(312) 372-2899

JUL 13 1998

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT is made effective for all purposes and in all respects as of the 1st day of January, 1998 by and between Illinois/Indiana EM-I Medical Services, S.C. (hereinafter the "Employer") and Wayne J. Baker, D.O. (hereinafter the "Employee").

WHEREAS, the Employer desires to employ the Employee, a professional practitioner in the practice of emergency medicine;

WHEREAS, the Employee desires to act for the Employer in the aforesaid capacity; and

WHEREAS, the Employer and the Employee desire to set forth in writing the terms and conditions of their agreements and understandings;

NOW, THEREFORE, in consideration of the foregoing, of the mutual promises herein contained, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed as follows:

## 1. REPRESENTATIONS.

Employee represents that he/she is a qualified physician duly licensed to practice medicine in all jurisdictions where he/she shall be required to perform his/her duties pursuant to this Agreement, including, but not limited to, the state of Illinois/Indiana. Employee also represents that he/she is not currently subject to any professional disciplinary proceeding of any state or federal authorities or to any disciplinary action of any hospital or other hospital facility in any jurisdiction.

## 2. TERM OF EMPLOYMENT AND TERMINATION.

Subject to the provisions in Section 10 and 14, the Employer and all subsidiaries and affiliates of the Employer, shall employ the Employee and the Employee agrees to be so employed commencing on or about January 1, 1998. The parties further agree that such employment shall continue until either party terminates pursuant to the terms of Section 10.

## 3. DUTIES OF EMPLOYEE

(a) Employee in accepting such employment by the Employer shall undertake and assume the responsibility of performing professional medical services in emergency medicine. Employer shall have the power to determine and control, within the confines of professional ethics, the specific physical location and duties to be performed by the Employee. Employee hereby agrees to act in a competent and professional manner in carrying out the duties of his/her employment and that he/she shall make all clinical decisions using his/her best medical judgment. Both the Employer and any hospital or other facility at which the Employee is on duty shall have the power to designate patients to be assigned to the Employee, and the Employee shall perform medical services for said patients. No person other than t

EXHIBIT

A

1

and said hospital shall have the right to designate, by name and description, the patients for whom Employee is to perform services and Employee shall not honor any designation by any other person or organization. Notwithstanding anything to the contrary herein, nothing in this Agreement shall be construed to restrict the Employee's duties and obligations to his/her patients, including, but not limited to, duties in the prescription or administration of medication and the performance of medical services with respect to any patient.

(b)     During the term of this Agreement, the Employee shall (i) have and maintain a valid and unrestricted license to practice medicine in the jurisdictions in which the Employee is licensed to practice medicine or in those states in which the Employee becomes licensed to practice medicine during the term of this Agreement, (ii) comply with, be controlled and governed by and otherwise provide medical services in accordance with all legal requirements, and the ethics and standard of care of the medical community where the Employee provides medical services pursuant to this Agreement, and (iii) obtain and retain full medical staff membership with appropriate clinical privileges at any hospital or health care facility at which medical services are to be provided by the Employee for and on behalf of the Employer. Procurement of temporary staff privileges pending the completion of the medical staff approval process shall satisfy the requirements of subpart (iii) of the preceding sentence, provided that the Employee actively pursues full appointment and actually receives full appointment within a reasonable time.

(c)     Employee agrees that he/she shall be on duty pursuant to this Agreement on average for the number of hours per month specified by Employer. The Employer shall have the full and absolute power, within reason, to modify the number of hours worked.

(d)     The Employee agrees to abide by any contracts, rules, regulations and any other policies and procedures covering the Employee established by either the Employer, EmCare, Inc., or by any hospital or medical facility at which the Employee is on duty pursuant to the terms of this Agreement.

(e)     The Employee shall be obligated to obtain required Continuing Medical Education (CME) in compliance with state licensure requirements in all states in which the Employee is licensed to practice medicine at the time of this Agreement or in which the Employee becomes licensed to practice during the term of this Agreement. Upon request by Employer, Employee shall provide a copy of the CME certificate to the Employer or its designee.

(f)     Notwithstanding anything to the contrary herein, the Employee agrees to provide the Employer with all information necessary to document Employer's citizenship and employment status and to sign all documents reasonably necessary to document the employment relationship contemplated herein and to properly designate the Employer or any subsidiaries or affiliates of the Employer as the designee of Employee's reassignment of rights pursuant to Section 7 hereof. The Employee acknowledges and agrees that notwithstanding anything to the contrary herein, the Employer may withhold payment to the Employee until such documents as the Employer may reasonably request are produced or signed, as applicable.

2

DA973460.097/-1+

4.    NON-INTERFERENCE CLAUSE

For and in consideration of the anticipated benefits to be derived from this Agreement, the Employee hereby agrees that during the term of this Agreement, and twelve (12) months after the termination of the Agreement, regardless of cause, Employee shall not directly or indirectly the solicit to provide like professional services, or induce, persuade, or attempt to persuade the Hospitals to terminate or breach contracts with Employer or with EmCare, Inc., a Delaware corporation, or any affiliates of EmCare, Inc. Notwithstanding any provision of Section 16 of this Agreement to the contrary, the Employee agrees that the damages and remedies at law for any breach under this Section 4 of this Agreement would be inadequate and that, in addition, in the event of a breach under this Section 4 of this Agreement, Employer may apply to a court of competent jurisdiction and be entitled to an injunction by such court to prevent a breach or further breach there of on the part of the Employee. Such injunction shall be in addition to damages or other relief afforded under Section 16 of this Agreement.

5.    PATIENT RECORDS AND DISCLOSURE OF INFORMATION

The Employee shall prepare and maintain such medical records incidental to the medical services that he/she performs hereunder as required under standard medical practices and as otherwise required by Employer. All patient records and case histories shall at all times remain the property of the Hospital or Employer. Included within the foregoing are all records and information coming into the possession of the Employer and Employee which are the property of any hospital and for which the Employer has assumed temporary or permanent custodial responsibility. Unless required by legal process, no medical or any other Employer or hospital records shall be displayed by the Employee to any person or entity not authorized by the Employer, except in strict accordance with medical ethics and such rules relating thereto as are promulgated by the Employer's Board of Directors or officers from time to time. Employee shall maintain appropriate documentation in completion of all medical records in compliance with all rules, regulations and guidelines established by state or federal governmental authorities, including, but not limited to, HCFA.

Employer and Employee recognize that during the course of his/her employment under this Agreement the Employee shall have access to Employer information and documents which are recognized as sole, exclusive and confidential property of the Employer. The Employee therefore agrees that he/she will not, during the term of his/her employment, divulge or disclose any information relating to the Employer to any other person or entity whatsoever, for any purpose whatsoever, including the use of such information by the Employee himself for the purposes of employment or the practice of medicine other than for the Employer pursuant to the terms of this Agreement.

It is understood that the prohibitions set forth in the preceding paragraphs do not apply to medical reports on patients or the purposes of consultation with, reference to other physicians for the patients' welfare and care, claims in connection with accidents or disability made by the patient, or other legitimate uses in furtherance of the Employer's business and the welfare of its patients or its contractual relationship with any hospital.

3

**6.** **COMPENSATION AND BENEFITS.**

    A.   Compensation: In consideration for the services provided to Employer as contemplated herein, the Employee shall receive as compensation the amount(s) set forth herein on Appendix A, which may be amended from time to time.

    B.   Benefits: Unless prohibited by law, the Employer shall make available to the Employee the same group health insurance, term life insurance, group disability insurance, and pension plan that the Employer provides to other employees, which notwithstanding anything to the contrary provided herein, may be amended by the Employer from time to time.

**7.** **FEES FOR MEDICAL SERVICES.**

    The Employee shall have no ownership interest in any amounts owed or collected for medical services performed by the Employee pursuant to this Agreement. The Employee hereby unconditionally assigns to the Employer and all subsidiaries and affiliates of the Employer to whom Employee is employed pursuant to Section 2 hereof, all amounts owed or collected for medical services performed by the Employee during the term of this Agreement, and shall assist the Employer in billing and collecting such amounts, which shall be the sole and exclusive property of the Employer. Upon request of Employer, Employee shall execute and deliver such additional documents and instruments as may be necessary to evidence or effect this assignment of fees, including without limitation, any documents necessary in order to allow Employer to bill and collect all amounts owed for medical services performed from Medicaid, Medicare, and any other third-party payors.

**8.** **EXPENSES.**

    Employee shall be entitled to reimbursement for required Continuing Medical Education ("CME"), professional fees or dues, subscriptions and medical equipment and supplies used directly in the Employee's duties under this Agreement for an amount not to exceed the amount so designated on Appendix A to this Agreement; provided, however, that the Employer shall retain the sole authority to determine if each such submitted expense is directly related to the Employee's duties herein.

**9.** **INSURANCE.**

    The Employer shall procure professional malpractice insurance for Employee which will be limited to activities of the Employee while performing services pursuant to this Agreement. Such insurance shall be under a "claims made" policy with maximum coverage of One Million Dollars ($1,000,000.00) per occurrence and Three Million Dollars ($3,000,000.00) aggregate per Employee. Upon the termination of this Agreement, Employer agrees to purchase an Extended Reporting Period Insurance (unlimited tail) to cover all claims/suits initiated against Employee relative to services performed pursuant to this Agreement.

4

## 10.  TERMINATION OF AGREEMENT AND EMPLOYMENT.

A.    The Employer and Employee hereby agree that during the term of this Agreement, and any extensions hereof, this Agreement and the employment of the Employee may be terminated and the Employee's compensation shall be measured to the date of such termination: (i) at will by either party with 90 days notice; (ii) immediately by mutual consent of both parties; or (iii) immediately upon the Employer providing written notice to the Employee upon the occurrence of any of the following events:

(1)    Suspension, revocation, cancellation or limitation of Employee's right to practice in any jurisdiction whether because of loss of Employee's license or any other reason, including, without limitation failure to obtain appropriate CME credits.

(2)    Revocation, in whole or in part of Employee's medical privileges as extended to him/her by the appropriate authorities of any hospital at which the Employer conducts its business.

(3)    Failure or refusal by the Employee to perform diligently his/her duties under this Agreement or to comply with the rules, regulations or other policies established by the Employer, EmCare, Inc., or any hospital or medical facility at which the Employee is on duty.

(4)    Conviction of the Employee of any felonious crime in any federal or state jurisdiction of the United States of America.

(5)    Unprofessional, unethical, immoral or fraudulent conduct by the Employee or a finding by any professional society of such conduct.

(6)    Proof of Employee's dishonesty with respect to his/her duties and obligations to the business and affairs of the Employer. If Employer shall believe Employee to be guilty of the foregoing and pending the establishment of proof of the same, the Employer may place Employee on leave of absence with or without pay, at Employer's sole discretion until the resolution of such matter.

(7)    Termination for whatever reason of Employer's, EmCare, Inc.'s, or a subsidiary of EmCare, Inc.'s contract to provide medical services at the hospital(s) or a hospital where the Employee is working.

(8)    In the event, due to circumstances beyond Employee's control, Employee shall be unable to perform his/her duties under this Agreement for any extended period covered by this Agreement.

B.    In addition, this Agreement shall be automatically terminated should the Employer be declared by a Court of competent jurisdiction to be bankrupt under the Federal Bankruptcy Act or shall be determined to be insolvent under the insolvency laws of the state of governance of this Agreement.

5

11.    CONFIDENTIALITY.

The Employee will not disclose any Confidential Information (as defined below) of the Employer without the Employer's express written authorization, such Confidential Information will not be used in any way directly or indirectly detrimental to the Employer, and the Employee will keep such Confidential Information confidential. If the Employee is requested or required (by oral questions, interrogatories, requests for information or documents, subpoenas, civil investigative demands, or similar processes) to disclose or produce any Confidential Information furnished in the course of its employment with the Employer, the Employee will (i) provide the Employer with prompt notice thereof and copies, if possible, and, if not, a description, of the Confidential Information requested or required to be produced so that the Employer may seek an appropriate protective order or waive compliance with the provisions of this Section and (ii) consult with the Employer as to the advisability of the Employer taking legally available action to resist or narrow such request. The Employee further agrees that, if in the absence of a protective order or the receipt of a waiver hereunder the Employee is nonetheless, in the written opinion of his legal counsel, compelled to disclose or produce Confidential Information concerning the Employer to any tribunal or to stand liable for contempt or suffer other censure or penalty, the Employee may disclose or produce such Confidential Information to such tribunal legally authorized to request and entitled to receive such Confidential Information without liability hereunder; provided, however, that the Employee shall give the Employer written notice of the Confidential Information to be so disclosed or produced as far in advance of its disclosure or production as is practicable and shall use reasonable efforts to obtain, to the greatest extent practicable, an order or other reliable assurance that confidential treatment will be accorded to such Confidential Information so required to be disclosed or produced. For the purposes of this Section, the term "Confidential Information" shall mean any information of Employer (whether written or oral), including all business management or economic studies, patient lists, proprietary forms, proprietary business or management methods, marketing data, fee schedules, or trade secrets of the Employer whether or not such Confidential Information is disclosed or otherwise made available to the Employee. Confidential Information shall also include the terms and provisions of this Agreement and any transaction or document otherwise executed by the parties to this Agreement. Confidential Information does not include any information that the Employee can establish (i) is or becomes generally available to and known by the public or medical community (other than as a result of an unpermitted disclosure directly or indirectly by the Employee); (ii) is or becomes available to the Employee on a non-confidential basis from a source other than the Employer or its Affiliates, provided that such source is not and was not bound by a confidentiality agreement with or other obligation of secrecy to the Employer of which the Employee has knowledge; or (iii) has already been or is hereafter independently acquired or developed by the Employee without violating any confidentiality agreement with or other obligation of secrecy to the Employer. The terms and provisions of this Section shall survive the termination of this Agreement.

12.    NOTICES.

Any and all notices required or permitted to be given pursuant to this Agreement shall be sufficient if in writing and hand delivered to the Employee or if forwarded by registered or

DA973460.097/-1+

certified mail, return receipt requested, to his/her then residence address. In the case of notices by the Employee to the Employer, the same manner of delivery mail shall be sufficient, as shall hand delivery either upon written receipt of any officer of the Employer (other than the Employee) or principal to the place of business address.

13. <u>ASSIGNABILITY.</u>

Neither this Agreement nor any right or interest hereunder shall be assignable by the Employee, his beneficiaries, or legal representatives without the Employer's prior written consent; provided, however, that nothing herein shall preclude (i) the Employee from designating a beneficiary to receive any benefit payable hereunder upon his death, (ii) the executors, administrators, or other legal representative of the Employee or his estate from assigning any rights hereunder to the person or persons entitled thereunto, (iii) the assignment by the Employer of the compensation owed to the Employee hereunder to a garnishee upon the receipt of a garnishment order of any local, state, or federal authority received by the Employer, or (iv) the assignment by the Employer of its rights and obligations under this Agreement.

14. <u>AMENDMENT.</u>

No amendment or modification of this Agreement shall be effective unless or until executed in writing by the parties hereto.

15. <u>WAIVER OF BREACH.</u>

The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver or breach of any other provision or any subsequent breach by any party.

16. <u>ARBITRATION.</u>

Subject to Section 4 of this Agreement, the parties hereby agree to submit all disputes relating to this Agreement to binding arbitration and agree that such arbitration shall be the sole and exclusive process for adjudication of disputes relating to the Agreement. The arbitrator shall be selected and the arbitration shall be conducted pursuant to the National Health Lawyers Association Alternate Dispute Resolution Service Rules of Procedure for Arbitration and pursuant to the rules and auspices of the American Arbitration Association; provided, however, that the National Health Lawyers Association Alternate Dispute Resolution Service Rules of Procedure for Arbitration shall prevail in all conflicts. Notwithstanding, any rules or provisions to the contrary, the arbitrator shall have full authority to award any relief, in law or equity, while the arbitrator deems appropriate to remedy any breach of this Agreement; provided, however, that the arbitrator must award attorney's fees to the prevailing party with respect to disputes relating to Section 4 of this Agreement. The arbitrator shall not have any authority to add to or subtract from the terms of this Agreement. Rather, the arbitrator's authority is limited to the strict interpretation of its terms. It is further agreed that any final award of the arbitrator can be reviewed by any court of competent jurisdiction under prevailing standards for reviewing arbitral awards. All arbitration proceedings shall be conducted in Dallas, Texas.

DA973460.097/-1#

17. **TERMINATION DUE TO LEGISLATURE OR ADMINISTRATIVE CHANGE.**

In the event that there are changes in the current federal or state laws or regulations regarding Medicare/Medicaid, the adoption of new legislation, or a change in other third party reimbursement systems which materially affect the reimbursement that the Employer or Employee may receive for their respective services, the Employer may immediately terminate this Agreement by providing appropriate notice under Section 12.

18. **GOVERNING LAW.**

THE CONSTRUCTION AND INTERPRETATION OF THIS AGREEMENT SHALL AT ALL TIMES AND IN ALL RESPECTS BE GOVERNED BY THE LAWS OF THE PRIMARY STATE IN WHICH EMPLOYEE PRACTICES MEDICINE PURSUANT OT THE TERMS OF THIS AGREEMENT.

19. **SEVERABILITY.**

If any provision of this Agreement shall be determined to be invalid, illegal or unenforceable in whole or in part, neither the validity of the remaining part of such provision nor the validity of any other provision of this Agreement shall in any way be affected thereby.

20. **COUNTERPARTS.**

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

21. **TAX WITHHOLDING.**

The Employee agrees that the Employer may withhold from any amount payable by the Employer hereunder such amounts as the Employer reasonably determines to be necessary for compliance with federal and state tax withholding requirements, in which event the Employer shall file such reports and make such payments as may be required thereunder.

22. **ENTIRE AGREEMENT.**

This Agreement and the attachment to this Agreement together constitute the entire agreement and understanding by and between the Employer and the Employee with respect to the employment herein referred to, and no representations, promises, agreements or understandings, written or oral, not herein contained shall be of any force or effect. No change or modification hereof shall be valid or binding unless the same is in writing and signed by the party intended to be bound.

**SIGNATURES INTENTIONALLY APPEAR ON FOLLOWING PAGE**

IN WITNESS WHEREOF, the Employer and the Employee have each duly executed this Agreement under seal as of the day and year first above written.

EMPLOYER

Date: 6-23-98

By: _James L. Murphy_
Name: JAMES L. MURPHY
Title: ITS AGENT

EMPLOYEE:

Date: 1/15/98

By: _Wayne J Baker D.O_
Name: WAYNE J. BAKER DO

DA973460.097/-1*

9

# APPENDIX A

## COMPENSATION AGREEMENT

EMPLOYER:                                    Illinois/Indiana EM-I Medical Services, S.C.

PHYSICIAN (EMPLOYEE):                        Wayne J. Baker, D.O.

EFFECTIVE DATE:                              July 1, 1998

HOURLY RATE:                                 $100.00/shift - $61.00/hr   Saint Bernard Hospital
                                             $56.00/hr - $61.00/hr       Good Samaritan Hospital

FACILITY:

MEDICAL DIRECTOR MONTHLY STIPEND:            $00.00* for Additional Services

                                         *  Less:  Employee's Portion of FICA (Social Security) Taxes
                                                    Employee's Portion of Medicare Taxes
                                                    Employee's Elective Deferral Plan Contribution
                                                    Employee's Elective 401(k) Contribution
                                                    Employee's Other Elective Deductions

BUSINESS EXPENSE REIMBURSEMENT LIMITATION:   $00.00

## Compensation Terms

This Appendix A sets forth the compensation arrangements between Employer and Employee required by Section 6(A) of the Employment Agreement (the "Agreement").

Until modified or terminated as provided in the Agreement, Employee shall receive after the Effective Date as compensation for all services rendered pursuant to the Agreement the following:

Employer will pay to Employee on the 20th day of each month following the month of Employee's services (the "Subject Month"):

   Total clinical hours worked during the Subject Month times the Hourly Rate.

   One-twelfth (1/12) of any Medical Director Stipend owed to the Employee, provided the Employee has performed the services described in Schedule 1 during the Subject Month.

Employer must receive in its office a completed Physician Time Allocation Sheet (prior to the 5th day of each month) before any applicable monthly check can be released for mailing, in order to comply with Medicare/Medicaid regulations.

Employee shall be reimbursed for business expenses for each calendar year in an amount not to exceed the Business Expense Reimbursement Limitation. In order to receive such reimbursement, the Employee shall submit receipts for all such expenses upon occurrence. Employer shall review such expense and if Employer determines such expenses were incurred for valid business reasons, Employer will reimburse Employee for such expenses within thirty (30) days of their submittance.

## Additional Services

This Appendix A also sets forth the additional services to be performed by Employee as required by Section 3(A) of the Agreement. Pursuant to the terms of the Agreement, the Employee shall perform the following additional services:

| None | Such additional services as set forth on Schedule 1 to this Appendix A. |
|------|-------------------------------------------------------------------------|

EXECUTED on the dates indicated below to be in effect as of the Effective Date.

EMPLOYER                                     EMPLOYEE

By: _____                  _____
Its: President   Agent                        Wayne J. Baker, D.O.
DA980580.011/1+

## APPENDIX A

COMPENSATION AGREEMENT


EMPLOYER:                                    Illinois/Indiana EM-I Medical Services, S.C

PHYSICIAN (EMPLOYEE):                        **Wayne Baker, D.O.**

FFECTIVE DATE:                               November 1, 1998

HOURLY RATE:                                 $71.00/hr - $76.00/hr

FACILITY:                                    Good Samaritan Hospital, Vincennes, IN

MEDICAL DIRECTOR MONTHLY STIPEND:            $00.00* for Additional Services

                                             *  Less:  Employee's Portion of FICA (Social Security) Taxes
                                                        Employee's Portion of Medicare Taxes
                                                        Employee's Elective Deferral Plan Contribution
                                                        Employee's Elective 401(k) Contribution
                                                        Employee's Other Elective Deductions

BUSINESS EXPENSE REIMBURSEMENT LIMITATION:   $00.00

Compensation Terms
This Appendix A sets forth the compensation arrangements between Employer and Employee required by Section 6(A) of the Employment Agreement (the "Agreement").

Until modified or terminated as provided in the Agreement, Employee shall receive after the Effective Date as compensation for all services rendered pursuant to the Agreement the following:

Employer will pay to Employee on the 20th day of each month following Employee's services (the "Subject Month"):

        Total clinical hours worked during the Subject Pay Month times the Hourly Rate.

        One-twelfth (1/12) of any Medical Director Stipend owed to the Employee, provided the Employee has performed the services described in Schedule 1 during the Subject Month.

Employer must receive in its office a completed Physician Time Allocation Sheet (prior to the 5th day of each month) before any applicable monthly check can be released for mailing, in order to comply with Medicare/Medicaid regulations.

Employee shall be reimbursed for business expenses for each calendar year in an amount not to exceed the Business Expense Reimbursement Limitation. In order to receive such reimbursement, the Employee shall submit receipts for all such expenses upon occurrence. Employer shall review such expense and if Employer determines such expenses were incurred for valid business reasons, Employer will reimburse Employee for such expenses within thirty (30) days of their submittance.

Additional Services
This Appendix A also sets forth the additional services to be performed by Employee as required by Section 3(A) of the Agreement. Pursuant to the terms of the Agreement, the Employee shall perform the following additional services:

| X | None | | Such additional services as set forth on Schedule 1 to this Appendix A. |
|---|------|---|---|

EXECUTED on the dates indicated below to be in effect as of the Effective Date.

EMPLOYER                                     EMPLOYEE

By: _C. Mihulely_                            _Wayne Bab B_
Its: President  Agent                        Wayne Baker, D.O.
DA980580.011/1+

## APPENDIX A

## COMPENSATION AGREEMENT

EMPLOYER:                                    Illinois/Indiana EM-I Medical Services, S.C.

PHYSICIAN (EMPLOYEE):              Wayne Baker, D.O.

EFFECTIVE DATE:                         January 1, 1999

HOURLY RATE:                             $23.00/hr - $46.00/hr       Edgewater Medical Center

FACILITY:

MEDICAL DIRECTOR MONTHLY STIPEND:        $00.00* for Additional Services

                                    *   Less:  Employee's Portion of FICA (Social Security) Taxes
                                                Employee's Portion of Medicare Taxes
                                                Employee's Elective Deferral Plan Contribution
                                                Employee's Elective 401(k) Contribution
                                                Employee's Other Elective Deductions

BUSINESS EXPENSE REIMBURSEMENT LIMITATION:        $00.00

Compensation Terms
This Appendix A sets forth the compensation arrangements between Employer and Employee required by Section 6(A) of the Employment Agreement (the "Agreement").

Until modified or terminated as provided in the Agreement, Employee shall receive after the Effective Date as compensation for all services rendered pursuant to the Agreement the following:

Employer will pay to Employee on the 20th day of each month following Employee's services (the "Subject Month"):

        Total clinical hours worked during the Subject Pay Month times the Hourly Rate.

        One-twelfth (1/12) of any Medical Director Stipend owed to the Employee, provided the Employee has performed the services described in Schedule 1 during the Subject Month.

Employer must receive in its office a completed Physician Time Allocation Sheet (prior to the 5th day of each month) before any applicable monthly check can be released for mailing, in order to comply with Medicare/Medicaid regulations.

Employee shall be reimbursed for business expenses for each calendar year in an amount not to exceed the Business Expense Reimbursement Limitation. In order to receive such reimbursement, the Employee shall submit receipts for all such expenses upon occurrence. Employer shall review such expense and if Employer determines such expenses were incurred for valid business reasons, Employer will reimburse Employee for such expenses within thirty (30) days of their submittance.

Additional Services
This Appendix A also sets forth the additional services to be performed by Employee as required by Section 3(A) of the Agreement. Pursuant to the terms of the Agreement, the Employee shall perform the following additional services:

| X | None | | Such additional services as set forth on Schedule 1 to this Appendix A. |
|---|------|---|------|

EXECUTED on the dates indicated below to be in effect as of the Effective Date.

EMPLOYER                                            EMPLOYEE

By: _C. Michulsky_                          _Wayne Baker D.O._
Its: President          Agent                   Wayne Baker, D.O.
DA980580.011/1+

## APPENDIX A

### COMPENSATION AGREEMENT

EMPLOYER:                                      Illinois/Indiana EM-I Medical Services, S.C

PHYSICIAN (EMPLOYEE):                   **WAYNE BAKER, D.O.**

FFECTIVE DATE:                               July 1, 1999

HOURLY RATE:                                  $100.00/shift - $61.0/hr

FACILITY:                                         Bethany Hospital

MEDICAL DIRECTOR MONTHLY STIPEND:      $00.00* for Additional Services

                                      *   Less:   Employee's Portion of FICA (Social Security) Taxes
                                                      Employee's Portion of Medicare Taxes
                                                      Employee's Elective Deferral Plan Contribution
                                                      Employee's Elective 401(k) Contribution
                                                      Employee's Other Elective Deductions

BUSINESS EXPENSE REIMBURSEMENT LIMITATION:   $00.00

Compensation Terms
This Appendix A sets forth the compensation arrangements between Employer and Employee required by Section 6(A) of the Employment Agreement (the "Agreement").

Until modified or terminated as provided in the Agreement, Employee shall receive after the Effective Date as compensation for all services rendered pursuant to the Agreement the following:

Employer will pay to Employee on the 10th day of each month following Employee's services (the "Subject Month"):

        Total clinical hours worked during the Subject Pay Month times the Hourly Rate.

        One-twelfth (1/12) of any Medical Director Stipend owed to the Employee, provided the Employee has performed the services described in Schedule 1 during the Subject Month.

Employer must receive in its office a completed Physician Time Allocation Sheet (prior to the 5th day of each month) before any applicable monthly check can be released for mailing, in order to comply with Medicare/Medicaid regulations.

Employee shall be reimbursed for business expenses for each calendar year in an amount not to exceed the Business Expense Reimbursement Limitation. In order to receive such reimbursement, the Employee shall submit receipts for all such expenses upon occurrence. Employer shall review such expense and if Employer determines such expenses were incurred for valid business reasons,

Employer will reimburse Employee for such expenses within thirty (30) days of their submittance.

Additional Services
This Appendix A also sets forth the additional services to be performed by Employee as required by Section 3(A) of the Agreement. Pursuant to the terms of the Agreement, the Employee shall perform the following additional services:

| X | None | Such additional services as set forth on Schedule 1 to this Appendix A. |
|---|------|-------------------------------------------------------------------------|

EXECUTED on the dates indicated below to be in effect as of the Effective Date.

EMPLOYER                                          EMPLOYEE

By: _C. Michulsky_                              _Wayne Baker B_
Its: President          _Agent_                  WAYNE BAKER, D.O.

APPENDIX A

COMPENSATION AGREEMENT


EMPLOYER:                                          Illinois/Indiana EM-I Medical Services, S.C.

PHYSICIAN (EMPLOYEE):                              WAYNE BAKER, D.O.

EFFECTIVE DATE:                                    July 12, 1999

HOURLY RATE:                                       $23.00/hour - $46.00/hour

FACILITY:                                          Grant Hospital

MEDICAL DIRECTOR MONTHLY STIPEND:                  $000.00* for Additional Services

                                                   *    Less:  Employee's Portion of FICA (Social Security) Taxes
                                                               Employee's Portion of Medicare Taxes
                                                               Employee's Elective Deferral Plan Contribution
                                                               Employee's Elective 401(k) Contribution
                                                               Employee's Other Elective Deductions

BUSINESS EXPENSE REIMBURSEMENT LIMITATION:   $000.00

Compensation Terms
This Appendix A sets forth the compensation arrangements between Employer and Employee required by Section 6(A) of the
Employment Agreement (the "Agreement").

Until modified or terminated as provided in the Agreement, Employee shall receive after the Effective Date as compensation for all
services rendered pursuant to the Agreement the following:

Employer will pay to Employee on the 10th day of each month following Employee's services (the "Subject Month"):

        Total clinical hours worked during the Subject Pay Month times the Hourly Rate.

        One-twelfth (1/12) of any Medical Director Stipend owed to the Employee, provided the Employee has performed the services
        described in Schedule 1 during the Subject Month.

Employer must receive in its office a completed Physician Time Allocation Sheet (prior to the 5th day of each month) before any
applicable monthly check can be released for mailing, in order to comply with Medicare/Medicaid regulations.

Employee shall be reimbursed for business expenses for each calendar year in an amount not to exceed the Business Expense
Reimbursement Limitation. In order to receive such reimbursement, the Employee shall submit receipts for all such expenses upon
occurrence. Employer shall review such expense and if Employer determines such expenses were incurred for valid business reasons,

Employer will reimburse Employee for such expenses within thirty (30) days of their submittance.

Additional Services
This Appendix A also sets forth the additional services to be performed by Employee as required by Section 3(A) of the Agreement.
Pursuant to the terms of the Agreement, the Employee shall perform the following additional services:

| X | None | | Such additional services as set forth on Schedule 1 to this Appendix A. |
|---|------|---|---|

EXECUTED on the dates indicated below to be in effect as of the Effective Date.


EMPLOYER                                           EMPLOYEE

By: C. Mchululy                                    Wayne Baker
Its: President  Agent                              WAYNE BAKER, D.O.
DA980580.011/1#

## AFFILIATION AGREEMENT

THIS EMERGENCY MEDICINE AFFILIATION AGREEMENT made as of this 1st day of July, 1996, by and between MIDWESTERN UNIVERSITY/CHICAGO COLLEGE OF OSTEOPATHIC MEDICINE ("MWU/CCOM"), an Illinois not-for-profit corporation, Bethany Hospital of Evangelical Hospitals Corporation, an affiliate of Advocate Health Care (the "Hospital"), an Illinois not-for-profit corporation and Emergency Medical Associates of Illinois, Inc., (the "Group"), an Illinois corporation.

WHEREAS, MWU/CCOM is engaged in the education of osteopathic medical students and physicians, and maintains, among others, a postdoctoral program for the education of emergency medicine residents (collectively, the "Program"); and

WHEREAS, Hospital is duly licensed in the State of Illinois to provide healthcare services to patients, and operates facilities for that purpose which are accredited by the JCAHO; and

WHEREAS, Group is engaged in the business of making the services of independent contractor physicians available to staff the emergency departments of hospitals and educating and training medical students and residents in emergency medicine; and

WHEREAS, Group has contracted with Hospital on a non-exclusive basis to provide emergency medical services to Hospital's patients; and

WHEREAS, MWU/CCOM desires to affiliate with Hospital and Group in order to expand the educational opportunities for its emergency medicine residents, Hospital desires to affiliate with MWU/CCOM by making its facilities and resources available to MWU/CCOM residents for emergency medicine postdoctoral education, and Group desires to affiliate with both parties in order to provide educational services to the emergency medicine residents assigned by MWU/CCOM to Hospital.

NOW, THEREFORE, in consideration of the mutual terms and covenants herein exchanged, the parties agree as follows:

A. <u>Statement of Affiliation</u>. Hospital shall affiliate with MWU/CCOM and the Group and accept for placement certain MWU/CCOM residents to perform such duties at Hospital as are in accordance with the mandates of the relevant emergency medicine residency accreditation body and pursuant to the terms and conditions set forth in this Agreement.

B. <u>Responsibilities of MWU/CCOM</u>. It shall be the overall responsibility of MWU/CCOM to design, coordinate and assure necessary


EXHIBIT
B

training, education and clinical experiences for residents placed at Hospital and assist in the implementation and supervision of the Program's operation at Hospital. In addition, the specific responsibilities of MWU/CCOM include, but are not limited to:

1.  Recruitment and Selection. MWU/CCOM shall recruit and, in consultation with Hospital and the Group, select from among qualified candidates or residents for placement at Hospital. At Hospital's request, and where feasible, MWU/CCOM shall schedule personal interviews for Hospital with prospective residents. MWU/CCOM shall provide information reasonably requested by Hospital regarding each prospective or assigned resident, subject to MWU's policies and the requirements of the Privacy Act of 1974 bearing on access to and disclosure of educational records.

2.  Scheduling. MWU/CCOM, in consultation with Hospital and the Group, shall create a schedule ("Schedule") for the assignment of emergency medicine residents at Hospital.

3.  Basic education program. MWU/CCOM, in consultation with Hospital and the Group and in accordance with accreditation requirements, shall design the basic educational aspects of the Program.

4.  Instruction of Hospital Personnel. MWU/CCOM, or its designated agents, shall, as necessary or appropriate, provide educational training, instructional resources and guidance to medical and other Hospital staff who will participate in or interface with the Program and its operation at Hospital. Such training shall be limited to the development of pedagogical skills used in the teaching and evaluation of postdoctoral emergency medicine education.

5.  Access to MWU/CCOM Library. Upon reasonable advance notice, MWU/CCOM shall provide access during non-peak hours to its Downers Grove library facilities for any Hospital staff directly involved in the Program. Any costs associated with use of the MWU/CCOM Library by Hospital personnel, e.g., copying or computer on-line costs, shall be the sole responsibility of Hospital.

6.  Osteopathic Principles.

MWU/CCOM shall be responsible for assuring that the training program designed for emergency medicine residents at Hospital is compatible with osteopathic precepts and standards and Hospital agrees that it will provide its facilities and such training in accordance with the Program as designed.

C.  Responsibilities of Hospital. It shall be the responsibility of Hospital to make its resources and facilities available to emergency medicine residents assigned to Hospital pursuant to this Agreement and to generally oversee the provision of emergency medicine education to them in those facilities. In

addition, Hospital's specific responsibilities shall include, but not be limited to:

1. Training. In consultation and cooperation with, and subject to the general supervision of MWU/CCOM's Office of Postdoctoral Education and the Group, Hospital shall provide a measurable quality clinical education experience for emergency medicine residents assigned to Hospital within the guidelines and principles of the Program established and agreed to by MWU/CCOM, the Group and Hospital. In this regard, Hospital shall make all applicable clinical departments and patient care areas available for such training and experiences. Additionally, Hospital shall make any of its continuing medical education programs and other educational and informational programs available to emergency medicine residents assigned hereunder.

2. Orientation program. Hospital shall provide a timely and comprehensive orientation program for emergency medicine residents placed at Hospital, which orientation shall include information on the relevant policies, rules and regulations and bylaws of Hospital, its Medical Staff and various clinical departments.

3. Accreditation. Hospital shall operate its facility so that the accredited status of the emergency medicine residency which make up the Program is maintained. In that regard, Hospital agrees to make any reasonable modification of the duties or training of emergency medicine residents at Hospital in order to comply with existing or revised accreditation standards. If Hospital refuses or fails to make such modifications, it shall be a material breach of this Agreement and, pursuant to Section K.2.c., MWU/CCOM shall have the right to reassign the affected residents to another hospital which is willing to accept such emergency medicine residents mid-term. However, the reassignment of residents from Hospital pursuant to this Section shall not relieve Hospital of its financial obligations under this Agreement.

4. Library. Hospital shall allow assigned residents access to its medical library.

5. Facilities. Hospital shall provide a suitable on-call room, lounge area and a secure locker for the use of each emergency medicine resident placed at Hospital.

6. NonDiscrimination. Hospital shall not unlawfully discriminate against any resident assigned hereunder and it shall cause its staff and employees to treat MWU/CCOM residents in a nondiscriminatory manner.

7. Director of Osteopathic Medical Education. Hospital, in consultation with MWU/CCOM and the Group, shall designate one member of its Medical Staff to serve as Director of Osteopathic

Medical Education ("DOME"). The DOME shall be responsible for the day-to-day supervision, coordination and implementation of the Program at Hospital and the evaluation of each resident in the Program at Hospital. As appropriate, MWU/CCOM shall train the DOME for such duties. The DOME shall be a member of the Medical Staff Education Committee and he or she shall also be permitted to attend all Medical Staff and Hospital meetings or become a member of all committees where attendance or membership is a requirement of a relevant accreditation body.

    D.   Responsibilities of Group.

    It shall be the responsibility of the Group, through its emergency medicine physicians on the medical staff of the Hospital, in cooperation with the MWU/CCOM Office of Postdoctoral Medicine, the DOME and Hospital, to

    1.   supervise on a day-to-day basis the MWU/CCOM emergency medicine residents assigned to Hospital by MWU/CCOM and provide educational experiences which meet the specifications of the program designed by MWU/CCOM's Office of Postdoctoral Education and all applicable requirements of the American Osteopathic Association ("AOA"), Bureau of Professional Education of the AOA or other applicable entities.

    2.   provide on-site administration of the Program, including but not limited to, scheduling and evaluation of residents.

    E.   Policies and Procedures Affecting Residents and Discipline of Residents.

    MWU/CCOM shall require all emergency medicine residents placed at Hospital pursuant to this Agreement to abide by the then current policies, rules, regulations and bylaws of Hospital, its Medical Staff and clinical departments, including, but not limited to, submission to reasonable testing, such as drug testing, physical examinations or inoculations. Hospital, in consultation with MWU/CCOM, may ask that any resident who materially fails to follow such policies, rules, regulations and bylaws be reassigned from Hospital. In the sole discretion of Hospital, Hospital may summarily dismiss any resident and escort him or her from Hospital property if, in Hospital's opinion, the acts or omissions of such resident are an imminent threat to the health or well-being of Hospital, its patients, staff or agents. In the event there is a conflict between the policies and procedures of MWU/CCOM and Hospital regarding the behavior of any resident placed at Hospital, such conflict shall be resolved through the cooperative efforts of the DOME and the Dean of CCOM.

F:\USERS\JELI\EMA\EMGROUP.003

F.  Professional, General Liability and Workers Compensation Insurance; Reciprocal Indemnifications.

1.  The Group, at its sole cost and expense, shall secure and maintain at all times relevant hereunder professional liability/malpractice insurance which provides coverage for all emergency medicine residents involved in the Program while working at Hospital or at an elective which is part of the Program (1) with minimum limits of $1 million/$3 million by group policy or $1 million/$1 million by individual insurance contracts; (2) with such deductibles as are acceptable to MWU/CCOM and Hospital in the exercise of their reasonable discretion; (3) issued by insurance companies of good reputation and of sound and adequate financial responsibility; (4) written on an "occurrence" basis, if possible, but if any coverage is written on a "claims made" basis, it (which includes any "nose" or "tail" coverage with respect thereto) must be continued in effect for all periods so as to provide coverage for any and all claims made at any time as a result of occurrences, incidents, acts or omissions which take place during the term of this Affiliation Agreement; and (5) shall, to the extent obtainable, have attached thereto endorsements to the effect that: (i) the coverage cannot be cancelled or materially changed without at least 30 days' prior written notice to Hospital and MWU/CCOM; (ii) the coverage provided is primary to any similar insurance carried or arranged for by Hospital or MWU/CCOM; and (iii) no act or omission of the insured shall affect the obligation of the insurer to pay the full amount of any loss sustained.

2.  The Group shall deliver to Hospital and MWU/CCOM certificates of insurance with respect to the coverages required to be maintained hereunder, including existing, additional and renewal coverages and naming Hospital and MWU as additional insureds thereunder.  In the case of any insurance about to expire, the Group shall deliver to Hospital and MWU certificates of insurance with respect to renewal, new or alternate insurance (meeting the requirements hereof in all respects) not less than 30 days prior to the respective dates of expiration.

3.  MWU/CCOM shall, at its sole cost and expense, secure and maintain at times relevant hereunder, comprehensive general liability insurance, which provides coverage for all emergency medicine residents involved in the Program while working at Hospital or at an elective which is part of the Program.  All such insurance shall, to the extent relevant, be issued and delivered in accordance with the terms and conditions set forth in paragraphs 1 and 2 hereof.

4.  The parties shall indemnify and hold one another harmless and their respective employees, physicians, staff, students, directors, trustees, officers and affiliated corporations (collectively "Indemnitees") from, for and against any and all claims, demands, liabilities, losses, damages, expenses, penalties, judgments, settlements and costs, including reasonable attorneys

fees, whether any of the foregoing be civil, criminal or administrative, arising from injury to or death of any person or loss of or damage to property in or upon Hospital facilities and caused by any negligence or purposeful acts or omissions of any of the parties or their respective employees, physicians, staff, students, directors, trustees or officers, except for injuries, death or damages related to allegations of medical malpractice by any of the above Indemnitees, and the foregoing reciprocal indemnification shall be in addition to any other rights to which the Indemnitees may be entitled under any other agreement or contract or their obligation to provide insurance as required by this Agreement. This reciprocal indemnification shall survive the termination of this Agreement for acts and omissions occurring during its term.

G. <u>Budget/Remuneration of Residents</u>.

1. The parties shall meet each year to determine the number of fulltime equivalent (FTE) residents that Hospital agrees to accept for the academic year beginning on the next July 1. Said discussions shall occur in sufficient time to reach agreement no later than November 1 of each contract year on the number of residents and their annual salary and benefits, plus an administrative fee and indirect costs incurred by MWU/CCOM (collectively, "Budgeted Amount"). The Budgeted Amount shall be set forth on Exhibit A, which will be attached hereto and made a part hereof and amended each year to reflect agreed changes. Hospital shall be obligated to accept for placement on the next July 1 the number of FTEs agreed to by the prior November 1. The fulltime FTE status of a resident is not reduced and, therefore, Hospital's obligation to pay the full Budgeted Amount to MWU/CCOM for each FTE is also not reduced because a resident completes some small portion of his or her clinical training at another hospital in order to meet accreditation standards unable to be satisfied within Hospital.

2. MWU/CCOM shall pay salaries and fringe benefits to each resident assigned to Hospital under the Program on a monthly or biweekly basis. Hospital shall thereafter reimburse MWU/CCOM the full Budgeted Amount per FTE as set forth on Exhibit A, which reimbursement shall be payable in twelve (12) equal monthly installments. All monthly payments shall be due and owing on the first (1st) day of each calendar month beginning on July 1 of each contract year, and a ten percent (10%) per annum interest penalty shall be added for any monthly payment not received by MWU/CCOM by the seventh (7th) day of each month.

H. <u>No Partnership/Third Party Rights</u>.

Nothing herein shall be deemed to create any association, partnership, joint venture or agency relationship between MWU/CCOM, the Group and Hospital. Nor shall this Agreement under any circumstance be construed to confer any rights or privileges on any third parties, and neither MWU/CCOM, the Group nor Hospital shall be

under any obligation to any third party by reason of this Agreement or any term thereof.

I.  Confidentiality.

Each party and their respective agents, employees, students and representatives shall protect from unauthorized disclosure all information, records and data pertaining to Hospital, its patients or residents placed at Hospital, or to the operations, facilities and staff of MWU/CCOM or the Group.

J.  Employment Practices and Recordkeeping.

1.  Each party's respective employment and healthcare practices and recordkeeping shall conform to all federal, state and local statutes, ordinances and rules and regulations.  Upon reasonable request, each party shall provide the other with any information or certificates which may be required to demonstrate compliance with such statutes, ordinances and rules and regulations or for licensure, accreditation and quality assurance purposes.

2.  In particular, all records regarding payments made or received or services rendered under this Agreement shall be maintained by the respective parties and any assignee of the parties for a period of not less than four (4) years, in such a manner as to be available for inspection upon the request of the Secretary of the United States Department of Health and Human Services or any agent thereof, or any other federal, state or local governmental agency authorized to review such records in connection with federal or state reimbursement to Hospital.

K.  Term and Termination.

1.  Term.  This Agreement shall be effective as of July 1, 1996 and shall continue for one year thereafter unless terminated sooner as provided in Paragraph K.2.

2.  Termination.  This Agreement shall renew automatically for successive one year terms unless

a.  Any party notifies the other in writing no later than July 1 of an intent not to renew on November 1.

b.  Upon such date and terms as the parties may mutually agree in writing;

c.  Upon 30 days written notice by one party to any other party of a material breach of this Agreement.  If, however, the breach is cured or substantial progress toward cure has occurred to the satisfaction of the nonbreaching party

within thirty (30) days of the receipt of such notice, then the notice of termination shall be without effect. However, in the event that the Group is the breaching party, Hospital and MWU/CCOM shall promptly renegotiate this Agreement and, to the extent possible, there shall be no disruption in the Program; or

d.  The Agreement may terminate immediately, at the discretion of MWU/CCOM if Hospital:

i.  sells, transfers, disposes of or yields control over its facilities and the equipment and services used to support its obligation under this Agreement;

ii.  assigns any of its rights or delegates its obligations hereunder; or

iii.  enters bankruptcy proceedings, executes an assignment for the benefit of creditors or ceases to exist;

iv.  loses its JCAHO accreditation, or any relevant accreditation by the Accreditation Council on Graduate Medical Education or any license to operate as a hospital.

e.  This Agreement may terminate immediately at the discretion of Hospital if the contract between the Group and Hospital is terminated for any reason and (1) the Group fails to maintain its professional liability insurance obligations hereunder or (2) MWU/CCOM, upon timely notice and demand from Hospital, fails to provide such insurance as required hereunder instead of the Group.

3.  Obligations and Rights Upon Termination.

In the event this Agreement is terminated for any reason except the material breach of MWU/CCOM, then Hospital shall owe MWU/CCOM an amount equal to the annual aggregate of the Budgeted Amounts remaining under this Agreement for each FTE assigned hereunder regardless of whether said residents are reassigned from Hospital to other facilities due to the termination, but less any amounts received by MWU/CCOM from said other facilities as reimbursement of the Budgeted Amount for any reassigned resident plus any out of pocket expenses incurred by MWU/CCOM in effecting said reassignments.

8

L.   Mediation.

     In the interest of expeditious resolution of any disputes which may arise hereunder and if said dispute continues for more than sixty (60) days, the parties agree to submit any such disputes for mediation in the metropolitan Chicago area prior to pursuing litigation or administrative review. The mediator shall be jointly selected by the parties and the costs shared equally. The procedures for selecting a mediator and the rules governing the mediation shall be those of the National Health Lawyers Association Alternative Dispute Resolution Service unless another mediator and rules are mutually agreed to by the parties.

M.   Miscellaneous.

     1.   Notices. Any notice required to be given under this Agreement shall be in writing and shall be considered duly served when personally delivered or sent by prepaid United States certified mail, return receipt requested or sent by express mail or facsimile, to each party as follows:

     If to MWU/CCOM at:

          John J. Fernandes, D.O., Acting Dean
          Midwestern University
          Chicago College of Osteopathic Medicine
          555 31st Street
          Downers Grove, IL  60515

     If to Group at:

          Robert Hambrick, DO
          Emergency Medical Associates of Illinois, Inc.
          485 So. Frontage Road, Suite 330
          Burr Ridge, IL 60521

     If to Hospital at:

          Lena Shields
          Chief Executive
          Bethany Hospital
          3435 West Van Buren Street
          Chicago, IL 60624-3359


or to such other address or person as the parties may designate from time to time.

     2.   Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois.

3. Entire Agreement. This Agreement and any attachments or exhibits hereto is the entire agreement between the parties and, except as may otherwise be proved by law or in a writing signed by the parties, this Agreement shall not be amended or supplemented.

4. Nonassignability. This Agreement shall not be assigned, delegated or transferred by any party without the express written consent of the other parties, except that any party may upon written notice to the other parties assign, delegate or transfer this Agreement to another corporation or entity, now or hereafter existing, which corporation is within the corporate family of the assigning, delegating or transferring party and possesses the requisite licenses and skills to perform hereunder; any unauthorized assignment shall be deemed a ground for termination pursuant to Paragraph K.2., hereto.

5. Binding on Successors in Interest. Subject to Paragraph M.4., the rights, duties and obligations hereunder shall extend to, be binding upon and inure to the benefit of the successors and assigns of each party.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized agents the day and year first above written.

MIDWESTERN UNIVERSITY/CHICAGO          BETHANY HOSPITAL OF EVANGELICAL
COLLEGE OF OSTEOPATHIC MEDICINE        HOSPITALS CORPORATION


By: _Kathleen H. Goeppinger_           By: _Lena Shields_ _Lena Shields_
    President                              Chief Executive


EMERGENCY MEDICAL ASSOCIATES
OF ILLINOIS, INC.

By: _Doyle P. Welter DO_

# EXHIBIT A

## PROPOSED BUDGET FOR AGREEMENT

Period    July 1, 1996      To    June 30, 1997

Charges to    Bethany Hospital    from Midwestern University/Chicago College of Osteopathic Medicine for the services of:

Two   (2) PGY 3   Emergency Medicine Residents @ $52,285 each

TOTAL                           $104,570

F:\USERS\JEL1\EMA\EMGROUP.001



**Healthcare/HIS**

Healthcare Insurance Services, Inc.
Healthcare Insurance Agency, Inc.

July 9, 1996

## EVIDENCE OF INSURANCE

This document is issued as a matter of information only and confers no rights upon the recipient. This evidence does not amend, extend or alter the coverage afforded by the policies below.

EVIDENCE OF INSURANCE ISSUED TO
Bethany Hospital
3435 West Van Buren
Chicago, Illinois 60624

NAMED INSURED
Emergency Medical Associates
of Illinois, P.C.
485 South Frontage Road, Suite 300
Burr Ridge, Illinois 60521

Midwestern University
555 31st Street
Downers Grove, Illinois 60515

## MEDICAL PROFESSIONAL LIABILITY INSURANCE - CLAIMS MADE COVERAGE

This is to verify that the policy(ies) of insurance listed below has been issued to the Named Insured above for the policy period indicated. Notwithstanding any requirement, term or condition of any contract or other document with respect to which this evidence may be issued or may pertain, the insurance afforded by the policy(ies) described herein is subject to all the terms, exclusions and conditions of such policy(ies), including any retroactive date(s).

Company and Policy Number
Lexington Insurance Company
Policy No. 563-2839

Limits
$1,000,000 per Claim
$3,000,000 any one person policy aggregate

Term
01/01/96 - 01/01/97

This policy(ies) provides coverage on a claims made basis and contains a seven (7) year Extended Reporting Period option.

As respects Bethany Hospital and Midwestern University, the above policy will respond to liability assumed by the Named Insured under an insured contract, but only to the extent that the liability is based on injury or damage caused by a medical incident arising out of professional services supplied by or the failure to supply such services by the Named Insured or anyone acting at the Named Insured's direction and for which such liability has been imposed vicariously upon the indemnitee in the insured contract.

Bethany Hospital and Midwestern University are included as Additional Insureds under this policy.

This policy(ies) provides coverage for all Medical Professionals employed or contracted by the above Named Insured, while they are working for or on behalf of the above Named Insured.

IF THE POLICY(IES) IS CANCELED, THE COMPANY WILL ATTEMPT TO GIVE THIRTY (30) DAYS PRIOR WRITTEN NOTICE OF SUCH CANCELLATION TO THE RECIPIENT.

HEALTHCARE INSURANCE AGENCY, INC.

William J. Reese

William J. Reese, Jr.

# RESIDENT CONTRACT

Institution No. _____ 1997 _____

Resident's AOA No. _____ 65829 _____

Year of Training ____ Third _____

City & State __ Downers Grove, IL ____

*This Contract,* is executed between Midwestern University/Chicago College of Osteopathic Medic:
(hereafter called the "Institution" and _____ Wayne Baker _____ D.O.
(hereafter called the "Resident").

# WITNESSETH:

WHEREAS, the Institution has been approved by the American Osteopathic Association (hereafter called the "AOA") for a training program of residents and has, as a condition for the continued maintenance of such approval, agreed to abide by the residency standards, rules and regulations, of the AOA, and

WHEREAS, the Resident has made application to the Institution for appointment to serve as a Resident in an AOA-approved residency, and said application has been accepted by the Institution's governing board,

NOW, THEREFORE, in consideration of the above and of their mutual promises contained herein, the Institution and the Resident agree as follows:

**A. THE INSTITUTION AGREES:**

1. To appoint the Resident into its residency program for _____ 12 _____ consecutive months, not to exceed twelve (12) months, beginning _____ July 1 _____, 19 99, and ending on _____ June 30 _____, 20 00.

2. To provide training for the Resident in the field of __ Emergency Medicine _____ by providing an educational program in accordance with AOA standards.

3. To define the duties of the Resident.

4. To clearly delineate policies and procedures for evaluation of resident performance, including provisions for promotion, demotion, retention, and dismissal. Such defined procedures shall allow for due process.

5. To provide for the payment to the Resident a stipend of $ 3,083.34 _____ /month.

6. To furnish the Resident with a written statement listing all benefits that will be provided by the Institution to the Resident including, but not limited to, health insurance and professional liability insurance.

7. To furnish the Resident with a written copy of the Institution's education program which will serve as a guide for residency training.

8. To present or cause to be presented to the Resident a certificate of residency upon satisfactory completion of the Institution's residency educational program.

**B. THE RESIDENT AGREES:**

1. To serve as a Resident in the field of ___ Emergency Medicine _____ during the entire period specified in Paragraph A.1. of this contract.

2. To perform all duties assigned by the Institution to him/her to the best of his/her ability, to maintain standards of professional competence as determined by the Institution, and to conduct himself/herself in a professional manner at all times.

3. To observe all rules and regulations of the Institution pertaining to residents.

4. To engage during the term of the residency only in such activities of a professional nature as are approved by the Institution and the AOA.

5. To refrain during the entire term of the residency from engaging or participating in any nonprofessional activities which would interfere with the Resident's effective performance of this contract.

**RESIDENT'S COPY**



EXHIBIT

C

## CHEMICAL DEPENDENCE TREATMENT AND RE-ENTRY

The resident may be terminated by his or her program director in consultation with the department chair and the DME.

If permitted to remain in the training program, the resident must request a medical leave of absence and must enroll in a chemical dependence program selected by the program director or (at the program director's discretion) may be invited to propose a program for review and approval by the program director and DME. The costs for enrollment in this program will be the responsibility of the resident in accordance with the individual's choice of health plan. The resident is responsible for payment of any uncovered treatment costs.

Medical leave for chemical dependence shall be documented in the resident's permanent file, and a report on the leave shall be part of any report released to support future applications for licensure, hospital privileges, and so on. All regulatory agencies will also be notified according to current law. Medical leave of absence and use of accrued sick, vacation time, etc., will be in accordance with Midwestern University policies and procedures.

The resident will be required to sign a re-entry contract.

## REPEAT DRUG OR ALCOHOL ABUSE FOLLOWING ENROLLMENT IN A CHEMICAL DEPENDENCE PROGRAM

The resident will be terminated by his/her program director in consultation with the department chair and the DME. The resident will not be allowed to continue in the program. The resident may re-apply to the program for any subsequent new training year, but requirements for re-application will be at the discretion of the program director and must be approved by the DME.

## NEW RESIDENTS WITH A DOCUMENTED HISTORY OF DRUG OR ALCOHOL ABUSE

The resident will be subject to the policy of "Repeat Drug or Alcohol Abuse Following Enrollment in a Chemical Dependence Program". The resident will be required to sign an addendum to their contract which sets forth additional requirements to remain in the program. These requirements will be at the discretion of the program director in consultation with the department chair and DME.

IN WITNESS WHEREOF, the parties have executed or caused their duly authorized representative to execute this Rider this _____ day of _____, 1999.

Midwestern University/Chicago College
of Osteopathic Medicine

_____
Resident

By: _____
Gary L. Slick, DO
Director of Medical Education

*1999-00*
*< rider.res >*

-4-

THIS RIDER to the Contract between Midwestern University/Chicago College of Osteopathic Medicine (MWU/CCOM) and Wayne Baker, D.O. the "resident").

1. <u>Rider Controls</u>. The provisions of this Rider are hereby made a part of the Contract as if inserted therein at length. If there are any inconsistencies between this Rider and the Contract, the provisions of the Contract shall be disregarded.

2. <u>Parties to be Bound</u>. The parties agree to the serious intent of the Contract and intend to be fully bound by the terms, conditions and promises made in the Contract and in this Rider. The resident acknowledges that his/her commitment to honor the Contract is important to MWU/CCOM for purposes of conducting its educational programs and arranging for duties and services to be carried out by residents at health care facilities owned, operated or affiliated with MWU/CCOM or its affiliates, and that MWU/CCOM is relying on the resident's commitment to carry out such duties and services.

3. <u>No Conflicts</u>. The resident represents and promises that he/she has not entered into and will not enter into any other contract or agreement with any hospital, entity or party which would conflict with the resident's obligations and undertakings under the contract at any time. It is the duty of the resident to inform the Program Director of any other such contracts.

4. <u>Mandatory Drug Testing Policy</u>. Midwestern University/Chicago College of Osteopathic Medicine and its corporate affiliates, maintain a drug-free environment consistent with the principles of the Drug Free Workplace Act. All offers of employment, including those extended to residents, are conditioned on the satisfactory results of a drug screening test performed prior to the first day of work. The Midwestern University/Chicago College of Osteopathic Medicine Policy for General Conduct and Drug/Alcohol Abuse (Pages 3 and 4) is hereby considered to be a part of this Rider to Resident Contract.

5. <u>Confidentiality</u>. The resident acknowledges that at all times during the term of this Contract and subsequent to termination, all medical records, business records, and materials of MWU/CCOM, its corporate affiliates generally deemed to be confidential or of a proprietary nature are and shall remain the sole property of MWU/CCOM or the relevant corporate affiliate and those records shall not be copied or removed from the MWU/CCOM premises except as needed by resident to perform his or her assigned duties hereunder. At all times during the term of this Contract, resident shall protect from unauthorized disclosure all information, records and data pertaining to MWU/CCOM, its patients, staff, employees, facilities or corporate affiliates.

6. <u>Professional Liability Insurance</u>. Professional liability insurance shall be available for the resident covering said resident for all MWU/CCOM approved or mandated activities. Such insurance shall not cover Resident for any "moonlighting" activities.

7. <u>Release of Information</u>. The resident authorizes MWU/CCOM to release his/her name and the fact of his/her entering into the Contract to the American Osteopathic Association and the National Resident Matching Program, Inc. conducted by the American Osteopathic Association (or any successor program).

8. <u>Additional Days of Duty in Event of Suspension</u>. In the event a resident is suspended from duty

-1-

for failure to abide by MWU/CCOM rules and/or regulations, MWU/CCOM may extend such individual's training program by the number of days of duty equal to the number of days of suspension.

9.  Liquidated Damages.  In the event that the resident shall breach the Contract and fails to provide the services called for under the Contract, MWU/CCOM will suffer or incur damages, losses and costs as a result.  In order to avoid the difficulty of determining the amount of such damages at the time of such breach, the parties wish to agree in advance that MWU/CCOM shall be entitled to the stipulated sum of $1,000.00 to compensate MWU/CCOM for such damages, losses or costs as may be incurred by MWU/CCOM as a result of the resident's breach (or anticipatory breach) for failure to provide services under the terms incurred by MWU/CCOM to collect this sum.  The parties agree that the foregoing dollar amount is not a penalty and is a reasonable estimate as of the date of execution of the Contract of the damages, losses, and costs (both direct and indirect) that would be incurred by MWU/CCOM in the event of such a breach by the resident.

10.  Parking.  Parking fees, if any at affiliate facilities while on assigned rotations, are the responsibility of the trainee.

11.  Miscellaneous.

A.  The Contract and this Rider shall be governed by, construed and enforced under the law of the State of Illinois.

B.  The Contract and this Rider are the complete agreement of the parties and may not be amended except by a written instrument signed by the parties.

MIDWESTERN UN       ..Y / CHICAGO COLLEGE OF      .. ?ATHIC MEDICINE

## POLICY FOR GENERAL CONDUCT AND DRUG/ALCOHOL ABUSE

Residents shall strive for excellence in all aspects of patient care delivery and teaching. This implies professional demeanor and conduct both in direct patient care and in communication with family members, other health care staff members, students, and support staff members.

Residents shall not use potentially addictive, abusive, or illicit drugs. Use of such drugs in any environment or in any amount is incompatible with safe clinical performance.

Residents shall not use alcohol when they may be called upon to provide direct patient care or advice to those providing direct care (for example, when on call). Use of alcohol is incompatible with safe clinical performance.

Residents shall not provide patient care under circumstances of possible physical, mental, or emotional lack of fitness that could interfere with the quality of that care. It is the responsibility of residents, upon identifying a situation in which themselves or another resident is impaired to the potential detriment of patient care, to notify the supervising physician to arrange for alternative patient care coverage.

## *FITNESS FOR DUTY*

All residents must remain fit for duty at all times. Midwestern University, through the DME or program director of an affiliated training site, may require that the resident undergo a fitness-for-duty evaluation at any time if there is cause to believe that he or she is impaired.

A fitness-for-duty evaluation may include a comprehensive medical evaluation (with a psychological assessment) and a drug and alcohol screening. Drug and alcohol screening procedure for each event will be in accordance with the policy of the affiliated hospital or clinic or Midwestern University, depending on the circumstances of the event. The costs of the testing is the responsibility of the resident. The results of this examination will be released to the resident's program director and department chair and to the DME.

A resident found to be impaired due to alcohol or drug use will be relieved of clinical duties and not permitted to drive. Alternative transportation home must be obtained by the resident.

Residents shall comply with this policy, cooperating fully with its provisions.

## *POLICY ON DRUG AND ALCOHOL ABUSE*

This policy applies to all residents and fellows of programs of Midwestern University. Drug and alcohol abuse is defined as the use of any potentially addictive, abusive, or illicit drug or the use of alcohol to the extent of even minor impairment of cognitive or motor function.

A drug test result will be considered positive if drugs are detected in an amount above established limits; a test result will be considered negative if drugs are detected in an amount below established limits. Impairment of cognitive or motor functions is defined as a situation of unusual or aberrant behavior including (but not limited to) slurred speech, unsteady gait, abusive language, disheveled appearance, or diminution of fine motor coordination.

-3-

C. THE PARTIES FURTHER AGREE:

1. That the Resident and the Institution are the only parties to this agreement. The AOA is not a party to this agreement.

2. That this contract may be terminated at any time by a Written Release by Mutual Consent. In the event of such termination, the Institution shall determine the amount of credit, if any, toward satisfying AOA residency education requirements to be awarded the Resident.

3. That if the Resident by action or inaction commits or allows to occur any action or course of action, which the Institution reasonably believes involved moral turpitude or is contrary to the interests of patient care or the general welfare of the Institution, the Institution may terminate the Resident's service without prior notice, and the Resident will not be issued another AOA Resident Contract for a program approved by the AOA for a period of one year from the date of termination, unless sooner exonerated.

4. That if the Resident fails to pursue satisfactorily the Institution's educational and clinical program, the Program Director / Director of Medical Education shall provide the Resident with no less than thirty (30) days prior written notice that the Resident will be placed on probationary status. Thereafter, if the identified deficiencies are not corrected, the Institution may terminate its relationship with the Resident.

5. That if the Institution loses its approval for resident training during the period of this contract, on the effective date of loss of such approval, the Resident shall have the option to be released from this contract and shall not be prohibited from immediately entering another Institution approved by the AOA for residency training. Also, effective on the date of loss of approval, the Institution shall terminate the residency training program, at which time the Resident shall be granted credit for that portion of the residency completed and released therefrom.

6. That if the Resident unilaterally terminates this contract in order to participate in a program which does not have AOA approval, the Resident, as a result, may be denied access to the AOA training approval process thereafter.

7. That the Institution and the Resident shall immediately notify the Council on Postdoctoral Training of the AOA in writing in the event of a breach or unilateral termination of this contract by either party or of the termination of this agreement by written release by mutual consent. In the event of mutual release, it shall be the duty of the Institution to send a signed copy of the release to the Council on Postdoctoral Training of the AOA.

8. That this contract incorporates by reference "Residency Training Requirements of the American Osteopathic Association", to the extent that the "Residency Training Requirements of the American Osteopathic Association" relate to the obligations of the parties hereto and do not conflict with the terms of this contract.

9. If the Resident changes specialty areas, the Resident may be allowed to start another AOA-approved program without regard to the one-year limitation in paragraph C.3. above.

IN WITNESS WHEREOF, this agreement has been executed by the parties hereto, to be effective as of the date of execution by the Institution.

Resident:

_____

Date: _____

Institution:

By: _____

Date: _____

(This proviso to be filled in only in the case of a Written Release by Mutual Consent.)

The parties hereby mutually consent to the release of their contractual obligations, as of the _____ day of _____, 20 ___

_____
(Resident).

_____
(Institution).

_____
(Witness)

Send to: Council on Postdoctoral Training
American Osteopathic Association
142 East Ontario Street
Chicago, Illinois 60611-2864

**Bethany - Attending**

**December, 1999**

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| | | | 1<br>1.Baker, W<br>2.Ting, L | 2<br>1.Baker, W<br>2.Jeser, M | 3<br>1.Boyle, T<br>2.Jeser, M | 4<br>1.Boyle, T<br>2.Pacini, J |
| 5<br>1.Baker, W<br>2.Pacini, J | 6<br>1.Baker, W<br>2.Ting, L | 7<br>1.Boyle, T<br>2.Ting, L | 8<br>1.Boyle, T<br>2.Pacini, J | 9<br>1.Baker, W<br>2.Oland, P | 10<br>1.Boyle, T<br>2.Jeser, M | 11<br>1.Allegretti, P<br>2.Oland, P |
| 12<br>1.Thai, T<br>2.Oland, P | 13<br>1.Allegretti, P<br>2.Oland, P | 14<br>1.Allegretti, P<br>2.Pacini, J | 15<br>1.Boyle, T<br>2.Jeser, M | 16<br>1.Boyle, T<br>2.Jeser, M | 17<br>1.Boyle, T<br>2.Pacini, J | 18<br>1.Baker, W<br>2.Ting, L |
| 19<br>1.Baker, W<br>2.Ting, L | 20<br>1.Boyle, T<br>2.Ting, L | 21<br>1.Baker, W<br>2.Jeser, M | 22<br>1.Thai, T<br>2.Pacini, J | 23<br>1.Boyle, T<br>2.Oland, P | 24<br>1.Baker, W<br>2.Ting, L | 25<br>1.Thai, T<br>2.Jeser, M |
| 26<br>1.Thai, T<br>2.Jeser, M | 27<br>1.Boyle, T<br>2.Oland, P | 28<br>1.Baker, W<br>2.Oland, P | 29<br>1.Boyle, T<br>2.Ting, L | 30<br>1.Boyle, T<br>2.Pacini, J | 31<br>1.Boyle, T<br>2.Pacini, J | |

1: 7:00a- 7:00p     2: 7:00p- 7:00a



EXHIBIT

**Bethany - Attending**

**January, 2000**

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|--------|--------|---------|-----------|----------|--------|----------|
|  |  |  |  |  |  | 1<br>1.Pham, M<br>2.Oland, P |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 | ① 7A - 7P<br>② 7P - 7A |  |  |  |  |

**Bethany/Resident**

**December, 1999**

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|--------|--------|---------|-----------|----------|--------|----------|
| | | | **1** 1.Hick, 2.Wankum, R | **2** 1.Hick, 2.Bowers, A | **3** 1.Hick, 2.Bowers, A | **4** 1.Carpenter, R 2.Wankum, R |
| **5** 1.Carpenter, R 2.Wankum, R | **6** 1.Carpenter, R 2.Wankum, R | **7** 1.Hick, 2.Wankum, R | **8** 1.Carpenter, R 2.Bowers, A | **9** 1.Carpenter, R 2.Wankum, R | **10** 1.Carpenter, R 2.Wankum, R | **11** 1.Hick, 2.Bowers, A |
| **12** 1.Hick, 2.Bowers, A | **13** 1.Hick, 2.Wankum, R | **14** 1.Carpenter, R 2.Wankum, R | **15** 1.Hick, 2.Bowers, A | **16** 1.Hick, 2.Bowers, A | **17** 1.Hick, 2.Bowers, A | **18** 1.Carpenter, R 2.Wankum, R |
| **19** 1.Carpenter, R 2.Wankum, R | **20** 1.Carpenter, R 2.Wankum, R | **21** 1.Hick, 2.Detrana, F | **22** 1.Carpenter, R 2.Wankum, R | **23** 1.Carpenter, R 2.Wankum, R | **24** 1.Carpenter, R 2.Wankum, R | **25** 1.Carpenter, R 2.Wankum, R |
| **26** 1.Hick, 2.Lang, N | **27** 1.Hick, 2.Bowers, A | **28** 1.Carpenter, R 2.Wankum, R | **29** 1.Hick, 2.Bowers, A | **30** 1.Hick, 2.Wankum, R | **31** 1.Hick, 2.Morosco, B | |

1:  7:00a- 7:00p     2:  7:00p- 7:00a

**Bethany/Resident**

**January, 2000**

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| | | | | | | 1<br>1.Hick,<br>2.Morosco, B |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 | | | | | |

(1) 7A - 7P   (2) 7P - 7A

**Edgewater Attending**

**December, 1999**

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| | | | **1**<br>1.Kallenborn, M<br>2.Walters, J | **2**<br>1.Kallenborn, M<br>2.Gear, B | **3**<br>1.Kallenborn, M<br>2.Oland, P | **4**<br>1.Kallenborn, M<br>2.Oland, P |
| **5**<br>1.Gear, B<br>2.Walters, J | **6**<br>1.Kallenborn, M<br>2.Oland, P | **7**<br>1.Allegretti, P<br>2.Oland, P | **8**<br>1.Allegretti, P<br>2.Jeser, M | **9**<br>1.Allegretti, P<br>2.Thai, T | **10**<br>1.Allegretti, P<br>2.Pacini, J | **11**<br>1.Kallenborn, M<br>2.Jeser, M |
| **12**<br>1.Kallenborn, M<br>2.Jeser, M | **13**<br>1.Kallenborn, M<br>2.Pacini, J | **14**<br>1.Kallenborn, M<br>2.Thai, T | **15**<br>1.Kallenborn, M<br>2.Thai, T | **16**<br>1.Allegretti, P<br>2.Thai, T | **17**<br>1.Allegretti, P<br>2.Jeser, M | **18**<br>1.Allegretti, P<br>2.Pacini, J |
| **19**<br>1.Allegretti, P<br>2.Pacini, J | **20**<br>1.Allegretti, P<br>2.Oland, P | **21**<br>1.Allegretti, P<br>2.Ting, L | **22**<br>1.Kallenborn, M<br>2.Walters, J | **23**<br>1.Kallenborn, M<br>2.Pacini, J | **24**<br>1.Kallenborn, M<br>2.Jeser, M | **25**<br>1.Oland, P<br>2.Bowers, A |
| **26**<br>1.Oland, P<br>2.Bowers, A | **27**<br>1.Allegretti, P<br>2.Thai, T | **28**<br>1.Allegretti, P<br>2.Thai, T | **29**<br>1.Allegretti, P<br>2.Pacini, J | **30**<br>1.Allegretti, P<br>2.Jeser, M | **31**<br>1.Allegretti, P<br>2.Walters, J | |

1:  7:00a- 7:00p    2:  7:00p- 7:00a

**Edgewater Attending**

**January, 2000**

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|--------|--------|---------|-----------|----------|--------|----------|
|  |  |  |  |  |  | 1<br>1.Outten, S<br>2.Bowers, A |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 | ① 7A - 7P<br>② 7A - 7A |  |  |  |  |

**Edgewater/Resident**

**December, 1999**

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|--------|--------|---------|-----------|----------|--------|----------|
| | | | 1<br>1.McJennett, R | 2<br>1.Milos, G | 3<br>1.Milos, G | 4<br>1.McJennett, R |
| 5<br>1.McJennett, R | 6<br>1.McJennett, R | 7<br>2.Milos, G | 8<br>1.McJennett, R | 9<br>1.McJennett, R | 10<br>1.McJennett, R | 11<br>1.Milos, G |
| 12<br>1.Milos, G | 13<br>1.Milos, G | 14<br>2.McJennett, R | 15<br>1.Milos, G | 16<br>1.Milos, G | 17<br>1.Milos, G | 18<br>1.McJennett, R |
| 19<br>1.McJennett, R | 20<br>1.McJennett, R | 21<br>2.Milos, G | 22<br>1.McJennett, R | 23<br>1.McJennett, R | 24<br>1.McJennett, R | 25<br>1.McJennett, R |
| 26<br>1.McJennett, R | 27<br>1.Milos, G | 28<br>2.McJennett, R | 29<br>1.Milos, G | 30<br>1.Milos, G | 31<br>1.Milos, G | |

1: 11:59a-11:59p     2: 11:59a-10:00p     3: 11:59a- 4:00p

**Edgewater/Resident**

**January, 2000**

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|--------|--------|---------|-----------|----------|--------|----------|
| | | | | | | 1<br>1.Milos, G |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 | | | | | |

# Grant - Attending

## December, 1999

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| | | | **1**<br>1.Baladad, M<br>2.Muns, T | **2**<br>1.Baladad, M<br>2.Walters, J | **3**<br>1.Baladad, M<br>2.Pacini, J | **4**<br>1.Ladipo, T<br>2.Walters, J |
| **5**<br>1.Ladipo, T<br>2.Bowers, A | **6**<br>1.Webster, D<br>2.Gear, B | **7**<br>1.Baladad, M<br>2.Pacini, J | **8**<br>1.Baladad, M<br>2.Thai, T | **9**<br>1.Webster, D<br>2.Bowers, A | **10**<br>1.Bhatt, T<br>2.Gear, B | **11**<br>1.Baladad, M<br>2.Walters, J |
| **12**<br>1.Baladad, M<br>2.Muns, T | **13**<br>1.Webster, D<br>2.Bowers, A | **14**<br>1.Webster, D<br>2.Walters, J | **15**<br>1.Baladad, M<br>2.Oland, P | **16**<br>1.Webster, D<br>2.Muns, T | **17**<br>1.Baladad, M<br>2.Muns, T | **18**<br>1.Fishman, F<br>2.Muns, T |
| **19**<br>1.Fishman, F<br>2.Thai, T | **20**<br>1.Webster, D<br>2.Gear, B | **21**<br>1.Webster, D<br>2.Muns, T | **22**<br>1.Baladad, M<br>2.Oland, P | **23**<br>1.Baladad, M<br>2.Ting, L | **24**<br>1.Webster, D<br>2.Pacini, J | **25**<br>1.Baladad, M<br>2.Ting, L |
| **26**<br>1.Fishman, F<br>2.Pacini, J | **27**<br>1.Fishman, F<br>2.Muns, T | **28**<br>1.Webster, D<br>2.Gear, B | **29**<br>1.Fishman, F<br>2.Thai, T | **30**<br>1.Fishman, F<br>2.Gear, B | **31**<br>1.Fishman, F<br>2.Bowers, A | |

1: 7:00a- 7:00p    2: 7:00p- 7:00a

**Grant - Attending**

**January, 2000**

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|--------|--------|---------|-----------|----------|--------|----------|
| | | | | | | 1 <br> 1.Piel, C <br> 2.Butvilas, K |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 | | | | | |

① 7A - 7P

② 7P - 7A

OFOMC/Resident

December, 1999

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| | | | **1**<br>1.Tucker, J<br>2.Gear, B | **2**<br>1.Tucker, J<br>2.Oland, P | **3**<br>1.Tucker, J<br>2.Lee, J | **4**<br>1.Tucker, J<br>2.Lee, J |
| **5**<br>1.Cruz, A<br>2.Lee, J | **6**<br>1.Cruz, A<br>2.Lang, N | **7**<br>1.Tucker, J<br>2.Muns, T | **8**<br>1.Hulsey, D<br>2.Lee, J | **9**<br>1.Hulsey, D<br>2.Lee, J | **10**<br>1.Hulsey, D<br>2.Lee, J | **11**<br>1.Tucker, J<br>2.Ting, L |
| **12**<br>1.Tucker, J<br>2.Pacini, J | **13**<br>1.Tucker, J<br>2.Lee, J | **14**<br>1.Hulsey, D<br>2.Lee, J | **15**<br>1.Tucker, J<br>2.Muns, T | **16**<br>1.Hulsey, D<br>2.Ting, L | **17**<br>1.Hulsey, D<br>2.Lee, J | **18**<br>1.Hulsey, D<br>2.Lee, J |
| **19**<br>1.Hulsey, D<br>2.Lee, J | **20**<br>1.Hulsey, D<br>2.Jeser, M | **21**<br>1.McLeod, W<br>2.Gear, B | **22**<br>1.Hulsey, D<br>2.Lee, J | **23**<br>1.Hulsey, D<br>2.Jeser, M | **24**<br>1.Hulsey, D<br>2.Lee, J | **25**<br>1.Carter, C<br>2.Lee, J |
| **26**<br>1.Stone, R<br>2.Walters, J | **27**<br>1.Carpenter, R<br>2.Walters, J | **28**<br>1.Hulsey, D<br>2.Lee, J | **29**<br>1.Carpenter, R<br>2.Lee, J | **30**<br>1.Hulsey, D<br>2.Lee, J | **31**<br>1.Hulsey, D<br>2.Tucker, J | |

1: 7:00a- 7:00p    2: 7:00p- 7:00a    3: 7:00a- 4:00p    4: 11:59p- 7:00a

**OFOMC/Resident**

**January, 2000**

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|--------|--------|---------|-----------|----------|--------|----------|
| | | | | | | 1<br>1.Holder, C<br>2.Cruz, A |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 | | | | | |

① 7A-7P

② 7P-7A

**PROVIDENT/RESIDENTS**

**December, 1999**

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| | | | **1**<br>1.Viscardi, D<br>1.Kuong, A<br>2.Morosco, B<br>2.Hussain, A | **2**<br>1.Butvilas, K<br>1.Viscardi, D<br>2.Morosco, B<br>2.Hussain, A | **3**<br>1.Butvilas, K<br>1.Viscardi, D<br>2.Morosco, B<br>2.Hussain, A | **4**<br>1.Choski, C<br>1.Kuong, A<br>2.Thomas, J<br>2.Bekic, M |
| **5**<br>1.Choski, C<br>1.Kuong, A<br>2.Thomas, J<br>2.Bekic, M | **6**<br>1.Viscardi, D<br>1.Kuong, A<br>2.Thomas, J<br>2.Bekic, M | **7**<br>1.Choski, C<br>1.Butvilas, K<br>2.Morosco, B<br>2.Hussain, A | **8**<br>1.Viscardi, D<br>1.Kuong, A<br>2.Thomas, J<br>2.Bekic, M | **9**<br>1.Viscardi, D<br>1.Kuong, A<br>2.Morosco, B<br>2.Hussain, A | **10**<br>1.Viscardi, D<br>1.Kuong, A<br>2.Morosco, B<br>2.Hussain, A | **11**<br>1.Choski, C<br>1.Butvilas, K<br>2.Morosco, B<br>2.Hussain, A |
| **12**<br>1.Choski, C<br>1.Butvilas, K<br>2.Morosco, B<br>2.Hussain, A | **13**<br>1.Butvilas, K<br>1.Viscardi, D<br>2.Thomas, J<br>2.Bekic, M | **14**<br>1.Butvilas, K<br>1.Viscardi, D<br>2.Thomas, J<br>2.Bekic, M | **15**<br>1.Viscardi, D<br>1.Kuong, A<br>2.Morosco, B<br>2.Hussain, A | **16**<br>1.Viscardi, D<br>1.Kuong, A<br>2.Morosco, B<br>2.Hussain, A | **17**<br>1.Viscardi, D<br>1.Kuong, A<br>2.Morosco, B<br>2.Hussain, A | **18**<br>1.Choski, C<br>1.Butvilas, K<br>2.Thomas, J<br>2.Bekic, M |
| **19**<br>1.Choski, C<br>1.Butvilas, K<br>2.Thomas, J<br>2.Bekic, M | **20**<br>1.Choski, C<br>1.Butvilas, K<br>2.Thomas, J<br>2.Bekic, M | **21**<br>1.Viscardi, D<br>1.Kuong, A<br>2.Morosco, B<br>2.Bekic, M | **22**<br>1.Viscardi, D<br>1.Kuong, A<br>2.Morosco, B<br>2.Hussain, A | **23**<br>1.Viscardi, D<br>1.Kuong, A<br>2.Thomas, J<br>2.Bekic, M | **24**<br>1.Choski, C<br>1.Butvilas, K<br>2.Thomas, J<br>2.Bekic, M | **25**<br>1.Viscardi, D<br>1.Kuong, A<br>2.Morosco, B<br>2.Hussain, A |
| **26**<br>1.Viscardi, D<br>1.Kuong, A<br>2.Morosco, B<br>2.Hussain, A | **27**<br>1.Viscardi, D<br>1.Kuong, A<br>2.Morosco, B<br>2.Hussain, A | **28**<br>1.Choski, C<br>1.Butvilas, K<br>2.Morosco, B<br>2.Hussain, A | **29**<br>1.Viscardi, D<br>1.Kuong, A<br>2.Thomas, J<br>2.Bekic, M | **30**<br>1.Butvilas, K<br>2.Thomas, J<br>2.Bekic, M | **31**<br>1.Butvilas, K<br>1.McCormick, J<br>2.Hussain, A<br>2.Bekic, M | |

1: 7:00a- 7:00p    2: 7:00p- 7:00a    3: 8:00a- 8:00p

**PROVIDENT/RESIDENTS**

**January, 2000**

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|--------|--------|---------|-----------|----------|--------|----------|
| | | | | | | 1<br>1.Viscardi. D<br>1.Kuong, A<br>2.Young, V<br>2.Lim, L |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 | | | | | |

① 7A - 7P
② 7P - 7A

# St Bernard Attending

## December, 1999

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| | | | **1**<br>1.Bajo, James<br>4.Jeser, M<br>4.Bekic, M | **2**<br>1.Dengler, G<br>4.Bogolub, D<br>4.Bekic, M | **3**<br>1.Bajo, James<br>4.Bogolub, D<br>4.Muns, T | **4**<br>1.Dengler, G<br>4.Bogolub, D<br>4.Muns, T |
| **5**<br>1.Dengler, G<br>4.Bogolub, D<br>4.Muns, T | **6**<br>2.Bajo, James<br>3.Dengler, G<br>4.Walters, J<br>4.Jeser, M | **7**<br>2.Bajo, James<br>3.Dengler, G<br>4.Walters, J<br>4.Gear, B | **8**<br>2.Bajo, James<br>3.Dengler, G<br>4.Walters, J<br>4.Muns, T | **9**<br>1.Bajo, James<br>4.Bogolub, D<br>4.Ting, L | **10**<br>1.Dengler, G<br>4.Bogolub, D<br>4.Thomas, J | **11**<br>1.Bajo, James<br>4.Gear, B<br>4.Bogolub, D |
| **12**<br>1.Bajo, James<br>4.Gear, B<br>4.Bogolub, D | **13**<br>2.Dengler, G<br>3.Bajo, James<br>4.Walters, J<br>4.Ting, L | **14**<br>2.Dengler, G<br>3.Bajo, James<br>4.Gear, B<br>4.Ting, L | **15**<br>2.Dengler, G<br>3.Bajo, James<br>4.Walters, J<br>4.Thomas, J | **16**<br>2.Dengler, G<br>3.Bajo, James<br>4.Oland, P<br>4.Walters, J | **17**<br>1.Bajo, James<br>4.Gear, B<br>4.Bogolub, D | **18**<br>1.Dengler, G<br>4.Walters, J<br>4.Bogolub, D |
| **19**<br>1.Dengler, G<br>4.Walters, J<br>4.Bogolub, D | **20**<br>1.Bajo, James<br>4.Walters, J<br>4.Bogolub, D | **21**<br>1.Bajo, James<br>4.Oland, P<br>4.Thomas, J | **22**<br>1.Dengler, G<br>4.Gear, B<br>4.Muns, T | **23**<br>1.Bajo, James<br>4.Bogolub, D<br>4.Muns, T | **24**<br>1.Thai, T<br>4.Gear, B<br>4.Bogolub, D | **25**<br>1.Baker, W<br>4.Gear, B<br>4.Bogolub, D |
| **26**<br>1.Baker, W<br>4.Gear, B<br>4.Bekic, M | **27**<br>2.Bajo, James<br>3.Dengler, G<br>4.Gear, B<br>4.Bekic, M | **28**<br>2.Bajo, James<br>3.Dengler, G<br>4.Thomas, J<br>4.Muns, T | **29'**<br>2.Bajo, James<br>3.Dengler, G<br>4.Jeser, M<br>4.Muns, T | **30**<br>2.Bajo, James<br>3.Dengler, G<br>4.Ting, L<br>4.Muns, T | **31**<br>2.Bajo, James<br>3.Dengler, G<br>4.Thomas, J<br>4.Muns, T | |

1: 7:00a- 7:00p     2: 6:00a- 2:00p     3: 2:00p-10:00p     4: 7:00p- 7:00a

**St Bernard Attending**

**January, 2000**

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| | | | | | | 1<br>1.Thai, T<br>4.Muns, T<br>4.Wankum, R |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 | | | | | |

(1) 7A - 7P
(4) 7P - 7A

**ST BERNARD/RESIDENTS**

*December, 1999*

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| | | | 1<br>1.McCormick, J | 2<br>1.Erisman, A<br>1.Cruz, A | 3<br>1.Erisman, A<br>1.Cruz, A | 4<br>1.McCormick, J |
| 5<br>1.McCormick, J | 6<br>1.McCormick, J | 7<br>1.McCormick, J | 8<br>1.Erisman, A<br>1.Cruz, A | 9<br>1.McCormick, J | 10<br>1.McCormick, J | 11<br>1.Erisman, A<br>1.Cruz, A |
| 12<br>1.Erisman, A<br>1.Cruz, A | 13<br>1.Erisman, A<br>1.Cruz, A | 14<br>1.McCormick, J | 15<br>1.Erisman, A<br>1.Cruz, A | 16<br>1.Erisman, A<br>1.Cruz, A | 17<br>1.Erisman, A<br>1.Cruz, A | 18<br>1.McCormick, J |
| 19<br>1.McCormick, J | 20<br>1.Erisman, A<br>1.Cruz, A | 21<br>1.Erisman, A<br>1.Cruz, A | 22<br>1.McCormick, J | 23<br>1.McCormick, J | 24<br>1.McCormick, J | 25<br>1.Erisman, A<br>1.Cruz, A |
| 26<br>1.Erisman, A<br>1.Cruz, A | 27<br>1.Erisman, A<br>1.Cruz, A | 28<br>1.McCormick, J | 29<br>1.Erisman, A<br>1.Cruz, A | 30<br>1.McCormick, J | 31<br>1.Bushell, D<br>1.Holder, C | |

1:  7:00a- 7:00p     2:  7:00p- 7:00a     3:  8:00a- 8:00p     4:  7:00a- 4:00p

5: 11:00p- 7:00a

**ST BERNARD/RESIDENTS**

**January, 2000**

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|--------|--------|---------|-----------|----------|--------|----------|
|  |  |  |  |  |  | 1<br>1.Bushell, D<br>1.Erisman, A |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31    7A - 7P |  |  |  |  |  |

**ST MARGARET N/RES**

**December, 1999**

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| | | | **1**<br>1.Stone, R<br>4.Bowers, A<br>5.Holder, C<br>5.Carter, C<br>5.Piel, C | **2**<br>1.Stone, R<br>4.DeTrana, F<br>5.Holder, C<br>5.Carter, C<br>5.Piel, C | **3**<br>1.McCormick, J<br>4.DeTrana, F<br>5.Holder, C<br>5.Carter, C<br>5.Piel, C | **4**<br>1.Stone, R<br>4.Lang, N |
| **5**<br>1.Stone, R<br>4.Lang, N | **6**<br>1.Stone, R<br>4.DeTrana, F<br>5.Holder, C<br>5.Carter, C<br>5.Piel, C | **7**<br>1.Stone, R<br>4.DeTrana, F<br>5.Holder, C<br>5.Carter, C<br>5.Piel, C | **8**<br>1.Choski, C<br>4.Lang, N<br>5.Holder, C<br>5.Carter, C<br>5.Piel, C | **9**<br>1.Stone, R<br>4.Lang, N<br>5.Holder, C<br>5.Carter, C<br>5.Piel, C | **10**<br>1.Choski, C<br>4.Lang, N<br>5.Holder, C<br>5.Carter, C<br>5.Piel, C | **11**<br>1.McCormick, J<br>4.DeTrana, F |
| **12**<br>1.Kuong, A<br>4.DeTrana, F | **13**<br>1.Kuong, A<br>4.DeTrana, F<br>5.Holder, C<br>5.Carter, C<br>5.Piel, C | **14**<br>1.Stone, R<br>4.DeTrana, F<br>5.Holder, C<br>5.Carter, C<br>5.Piel, C | **15**<br>1.Stone, R<br>4.Lang, N<br>5.Holder, C<br>5.Carter, C<br>5.Piel, C | **16**<br>1.Butvilas, K<br>4.DeTrana, F<br>5.Holder, C<br>5.Carter, C<br>5.Tucker, J<br>5.Piel, C | **17**<br>1.Choski, C<br>4.DeTrana, F<br>5.Holder, C<br>5.Carter, C<br>5.Tucker, J<br>5.Piel, C | **18**<br>1.Stone, R<br>4.Lang, N |
| **19**<br>1.Stone, R<br>4.Lang, N | **20**<br>1.Stone, R<br>4.Lang, N<br>5.Holder, C<br>5.Carter, C<br>5.Tucker, J<br>5.Piel, C | **21**<br>1.Butvilas, K<br>4.Lang, N<br>5.Holder, C<br>5.Carter, C<br>5.Tucker, J<br>5.Piel, C | **22**<br>1.Stone, R<br>4.DeTrana, F<br>5.Holder, C<br>5.Carter, C<br>5.Tucker, J<br>5.Piel, C | **23**<br>1.Stone, R<br>4.Lang, N<br>5.Holder, C<br>5.Carter, C<br>5.Tucker, J<br>5.Piel, C | **24**<br>1.Stone, R<br>4.DeTrana, F<br>5.Holder, C<br>5.Carter, C<br>5.Tucker, J<br>5.Piel, C | **25**<br>1.Choski, C<br>4.DeTrana, F |
| **26**<br>1.McCormick, J<br>4.DeTrana, F | **27**<br>1.Choski, C<br>4.DeTrana, F<br>5.Holder, C<br>5.Carter, C<br>5.Tucker, J<br>5.Piel, C | **28**<br>1.Stone, R<br>4.DeTrana, F<br>5.Holder, C<br>5.Carter, C<br>5.Tucker, J<br>5.Piel, C | **29**<br>1.Butvilas, K<br>4.Lang, N<br>5.Holder, C<br>5.Carter, C<br>5.Tucker, J<br>5.Piel, C | **30**<br>1.Stone, R<br>4.Lang, N<br>5.Holder, C<br>5.Carter, C<br>5.Tucker, J<br>5.Piel, C | **31**<br>1.Stone, R<br>4.Lang, N<br>5.Carter, C<br>5.Tucker, J<br>5.Piel, C | |

1: 7:00a- 7:00p   2: 11:00a-11:00p   3: 11:00a-10:00p   4: 7:00p- 7:00a
5: 8:00a- 8:00p   6: 7:00a- 4:00p   7: 11:59p- 7:00a

ST MARGARET N/RES

January, 2000

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|--------|--------|---------|-----------|----------|--------|----------|
|        |        |         |           |          |        | 1<br>1.Wiziecki, L<br>4.DeTrana, F |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 | | | | | |

(1) 7A - 7P
(4) 7P - 7A

```
TRINITY/RES
```

```
December, 1999
```

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| | | | 1<br>1.McLeod, W | 2<br>1.McLeod, W | 3<br>1.McLeod, W | 4<br>1.Dilan, L |
| 5<br>1.Dilan, L | 6<br>1.Dilan, L | 7<br>2.Dilan, L | 8<br>1.McLeod, W | 9<br>1.Dilan, L | 10<br>1.Dilan, L | 11<br>1.McLeod, W |
| 12<br>1.McLeod, W | 13<br>1.McLeod, W | 14<br>2.McLeod, W | 15<br>1.Dilan, L | 16<br>1.McLeod, W | 17<br>1.McLeod, W | 18<br>1.Dilan, L |
| 19<br>1.Dilan, L | 20<br>1.Dilan, L | 21<br>2.Dilan, L | 22<br>1.McLeod, W | 23<br>1.Dilan, L | 24<br>1.McLeod, W | 25<br>1.McLeod, W |
| 26<br>1.McLeod, W | 27<br>1.McLeod, W | 28<br>2.McLeod, W | 29<br>1.Dilan, L | 30<br>1.Dilan, L | 31<br>1.Dilan, L | |

```
1: 11:00a-11:00p    2: 11:00a-10:00p
```

**TRINITY/RES**

**January, 2000**

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|--------|--------|---------|-----------|----------|--------|----------|
| | | | | | | 1<br>1.Dilan, L |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 | | | | | |

# Edgewater Attending

# February, 2000

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| | | **1**<br>1.Allegretti, P<br>2.Walters, J | **2**<br>1.Allegretti, P<br>2.Oland, P | **3**<br>1.Allegretti, P<br>2.Walters, J | **4**<br>1.Allegretti, P<br>2.Pham, M | **5**<br>1.Allegretti, P<br>2.Bowers, A |
| **6**<br>1.Kallenborn, M<br>2.Piel, C | **7**<br>1.Kallenborn, M<br>2.Walters, J | **8**<br>1.Kallenborn, M<br>2.Baker, W | **9**<br>1.Kallenborn, M<br>2.Oland, P | **10**<br>1.Allegretti, P<br>2.Jeser, M | **11**<br>1.Kallenborn, M<br>2.Jeser, M | **12**<br>1.Allegretti, P<br>2.Muns, T |
| **13**<br>1.Kallenborn, M<br>2.Muns, T | **14**<br>1.Kallenborn, M<br>2.Rosier, T | **15**<br>1.Allegretti, P<br>2.Rosier, T | **16**<br>1.Kallenborn, M<br>2.Brown, K | **17**<br>1.Allegretti, P<br>2.Pacini, J | **18**<br>1.Allegretti, P<br>2.Pham, M | **19**<br>1.Kallenborn, M<br>2.Brown, K |
| **20**<br>1.Kallenborn, M<br>2.Brown, K | **21**<br>1.Kallenborn, M<br>2.Rosier, T | **22**<br>1.Kallenborn, M<br>2.Bowers, A | **23**<br>1.Kallenborn, M<br>2.Rosier, T | **24**<br>1.Jeser, M<br>2.Bowers, A | **25**<br>1.Kallenborn, M<br>2.Piel, C | **26**<br>1.Jeser, M<br>2.Piel, C |
| **27**<br>1.Jeser, M<br>2.Pacini, J | **28**<br>1.Allegretti, P<br>2.Brown, K | **29**<br>1.Allegretti, P<br>2.Brown, K | | | | |

1: 7:00a- 7:00p    2: 7:00p- 7:00a



EXHIBIT

tabbles

E

**Grant - Attending**

**February, 2000**

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|--------|--------|---------|-----------|----------|--------|----------|
| | | **1**<br>1.Webster, D<br>2.Muns, T | **2**<br>1.Baladad, M<br>2.Bowers, A | **3**<br>1.Baladad, M<br>2.Rosier, T | **4**<br>1.Webster, D<br>2.Muns, T | **5**<br>1.Fishman, F<br>2.Oland, P |
| **6**<br>1.Fishman, F<br>2.Brown, K | **7**<br>1.Webster, D<br>2.Oland, P | **8**<br>1.Baladad, M<br>2.Oland, P | **9**<br>1.Fishman, F<br>2.Walters, J | **10**<br>1.Webster, D<br>2.Walters, J | **11**<br>1.Fishman, F<br>2.Brown, K | **12**<br>1.Baladad, M<br>2.Oland, P |
| **13**<br>1.Baladad, M<br>2.Piel, C | **14**<br>1.Webster, D<br>2.Oland, P | **15**<br>1.Webster, D<br>2.Ting, L | **16**<br>1.Fishman, F<br>2.Pacini, J | **17**<br>1.Baladad, M<br>2.Piel, C | **18**<br>1.Baladad, M<br>2.Brown, K | **19**<br>1.Webster, D<br>2.Rosier, T |
| **20**<br>1.Ladipo, T<br>2.Rosier, T | **21**<br>1.Webster, D<br>2.Bowers, A | **22**<br>1.Baladad, M<br>2.Brown, K | **23**<br>1.Baladad, M<br>2.Pacini, J | **24**<br>1.Baladad, M<br>2.Piel, C | **25**<br>1.Fishman, F<br>2.Oland, P | **26**<br>1.Baladad, M<br>2.Pacini, J |
| **27**<br>1.Baladad, M<br>2.Bowers, A | **28**<br>1.Fishman, F<br>2.Bowers, A | **29**<br>1.Fishman, F<br>2.Piel, C | | | | |

1:  7:00a- 7:00p     2:  7:00p- 7:00a

**OFOMC/Resident**

**February, 2000**

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| | | **1**<br>1.McGinn, D<br>2.Cruz, A | **2**<br>1.Carpenter, R<br>2.Cruz, A | **3**<br>1.Carpenter, R<br>2.Oland, P | **4**<br>1.Webb, J<br>2.Bowers, A | **5**<br>1.Carpenter, R<br>2.Cruz, A |
| **6**<br>1.Carpenter, R<br>2.Cruz, A | **7**<br>1.Carpenter, R<br>2.Bowers, A | **8**<br>1.Carpenter, R<br>2.Cruz, A | **9**<br>1.Pham, M<br>2.Piel, C | **10**<br>1.Carpenter, R<br>2.Cruz, A | **11**<br>1.Carpenter, R<br>2.Cruz, A | **12**<br>1.Milos, G<br>2.Piel, C |
| **13**<br>1.Milos, G<br>2.Oland, P | **14**<br>1.Pham, M<br>2.Pacini, J | **15**<br>1.Pham, M<br>2.Pacini, J | **16**<br>1.Carpenter, R<br>2.Cruz, A | **17**<br>1.Carpenter, R<br>2.Rosier, T | **18**<br>1.Carpenter, R<br>2.Rosier, T | **19**<br>1.Jeser, M<br>2.Ting, L |
| **20**<br>1.Jeser, M<br>2.Cruz, A | **21**<br>1.Carpenter, R<br>2.Cruz, A | **22**<br>1.Carpenter, R<br>2.Cruz, A | **23**<br>1.Carpenter, R<br>2.Cruz, A | **24**<br>1.Viscardi, D<br>2.Brown, K | **25**<br>1.Carpenter, R<br>2.Brown, K | **26**<br>1.Carpenter, R<br>2.Cruz, A |
| **27**<br>1.Carpenter, R<br>2.Cruz, A | **28**<br>1.McGinn, D<br>2.Piel, C | **29**<br>1.Carpenter, R<br>2.Rosier, T | | | | |

1:  7:00a- 7:00p     2:  7:00p- 7:00a     3:  7:00a- 4:00p     4: 11:59p- 7:00a

**PROVIDENT/RESIDENTS**

**February, 2000**

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| | | **1**<br>1.Morosco, B<br>1.Dilan, L<br>2.Outten, S<br>2.DeTrana, F | **2**<br>1.Morosco, B<br>1.Dilan, L<br>2.Outten, S<br>2.DeTrana, F | **3**<br>1.Young, V<br>1.Morosco, B<br>2.Bekic, M<br>2.Wiziecki, L | **4**<br>1.Morosco, B<br>1.Dilan, L<br>2.DeTrana, F<br>2.Bekic, M | **5**<br>1.Young, V<br>1.Dilan, L<br>2.DeTrana, F<br>2.Bekic, M |
| **6**<br>1.Young, V<br>1.Dilan, L<br>2.Outten, S<br>2.DeTrana, F | **7**<br>1.Young, V<br>1.Morosco, B<br>2.Outten, S<br>2.Wiziecki, L | **8**<br>1.Morosco, B<br>1.Dilan, L<br>2.Outten, S<br>2.Wiziecki, L | **9**<br>1.Young, V<br>1.Morosco, B<br>2.DeTrana, F<br>2.Wiziecki, L | **10**<br>1.Young, V<br>1.Dilan, L<br>2.DeTrana, F<br>2.Bekic, M | **11**<br>1.Young, V<br>1.Morosco, B<br>2.Outten, S<br>2.Bekic, M | **12**<br>1.Morosco, B<br>1.Dilan, L<br>2.Outten, S<br>2.Wiziecki, L |
| **13**<br>1.Morosco, B<br>1.Dilan, L<br>2.Bekic, M<br>2.Wiziecki, L | **14**<br>1.Morosco, B<br>1.Dilan, L<br>2.Outten, S<br>2.Bekic, M | **15**<br>1.Young, V<br>1.Choski, C<br>2.Bekic, M<br>2.Wiziecki, L | **16**<br>1.Young, V<br>1.Choski, C<br>2.Butvilas, K<br>2.Wiziecki, L | **17**<br>1.Young, V<br>1.Morosco, B<br>2.Outten, S<br>2.Butvilas, K | **18**<br>1.Young, V<br>1.Morosco, B<br>2.Outten, S<br>2.Wiziecki, L | **19**<br>1.Morosco, B<br>1.Choski, C<br>2.Outten, S<br>2.Wiziecki, L |
| **20**<br>1.Morosco, B<br>1.Choski, C<br>2.Butvilas, K<br>2.Wiziecki, L | **21**<br>1.Young, V<br>1.Choski, C<br>2.Butvilas, K<br>2.Bekic, M | **22**<br>1.Young, V<br>1.Choski, C<br>2.Bekic, M<br>2.Wiziecki, L | **23**<br>1.Young, V<br>1.Morosco, B<br>2.Butvilas, K<br>2.Wiziecki, L | **24**<br>1.Young, V<br>1.Morosco, B<br>2.Butvilas, K<br>2.Bekic, M | **25**<br>1.Morosco, B<br>1.Choski, C<br>2.Bekic, M<br>2.Wiziecki, L | **26**<br>1.Young, V<br>1.Choski, C<br>2.Butvilas, K<br>2.Wiziecki, L |
| **27**<br>1.Young, V<br>1.Choski, C<br>2.Butvilas, K<br>2.Wiziecki, L | **28**<br>1.Young, V<br>1.Choski, C<br>2.Butvilas, K<br>2.Wiziecki, L | **29**<br>1.Young, V<br>1.Morosco, B<br>2.Bekic, M<br>2.Wiziecki, L | | | | |

1: 7:00a- 7:00p    2: 7:00p- 7:00a    3: 8:00a- 8:00p

**St Bernard Attending**

**February, 2000**

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| | | **1**<br>1.Bajo, J<br>4.Bowers, A<br>4.Piel, C | **2**<br>1.Dengler, G<br>4.Pacini, J<br>4.Piel, C | **3**<br>1.Bajo, J<br>4.Bogolub, D<br>4.Pham, M | **4**<br>1.Bajo, J<br>4.Bogolub, D<br>4.Outten, S | **5**<br>1.Dengler, G<br>4.Bogolub, D<br>4.McCormick, J |
| **6**<br>1.Dengler, G<br>4.Bogolub, D<br>4.Pacini, J | **7**<br>1.Bajo, J<br>4.Bekic, M<br>4.Pacini, J | **8**<br>1.Bajo, J<br>4.Bekic, M<br>4.Pacini, J | **9**<br>1.Dengler, G<br>4.Bogolub, D<br>4.Bowers, A | **10**<br>1.Bajo, J<br>4.Bogolub, D<br>4.Bowers, A | **11**<br>1.Dengler, G<br>4.Bogolub, D<br>4.Pacini, J | **12**<br>1.Bajo, J<br>4.Bogolub, D<br>4.Bowers, A |
| **13**<br>1.Bajo, J<br>4.Outten, S<br>4.Bowers, A | **14**<br>1.Dengler, G<br>4.Bowers, A<br>4.Piel, C | **15**<br>1.Dengler, G<br>4.Bogolub, D<br>4.Piel, C | **16**<br>1.Bajo, J<br>4.Bogolub, D<br>4.Bowers, A | **17**<br>1.Dengler, G<br>4.Bogolub, D<br>4.Bekic, M | **18**<br>1.Bajo, J<br>4.Bowers, A<br>4.Piel, C | **19**<br>1.Dengler, G<br>4.Piel, C<br>4.Pham, M |
| **20**<br>1.Dengler, G<br>4.Pacini, J<br>4.Piel, C | **21**<br>1.Bajo, J<br>4.Outten, S<br>4.Pacini, J | **22**<br>1.Dengler, G<br>4.Bogolub, D<br>4.Piel, C | **23**<br>1.Bajo, J<br>4.Bogolub, D<br>4.Outten, S | **24**<br>1.Bajo, J<br>4.Bogolub, D<br>4.Outten, S | **25**<br>1.Dengler, G<br>4.Bogolub, D<br>4.Pacini, J | **26**<br>1.Bajo, J<br>4.Outten, S<br>4.Bowers, A |
| **27**<br>1.Bajo, J<br>4.Dengler, G<br>4.Outten, S | **28**<br>1.Bajo, J<br>4.Bogolub, D<br>4.Outten, S | **29**<br>1.Dengler, G<br>4.Bogolub, D<br>4.Pacini, J | | | | |

1:  7:00a- 7:00p     2:  6:00a- 2:00p     3:  2:00p-10:00p     4:  7:00p- 7:00a

**ST MARGARET N/RES**

**February, 2000**

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| | | **1**<br>1.Webb, J<br>4.Kuong, A<br>5.Holder, C<br>5.Carter, C<br>5.Collins, G<br>5.Sclar, A | **2**<br>1.Webb, J<br>4.Kuong, A<br>5.Holder, C<br>5.Carter, C<br>5.Collins, G<br>5.Sclar, A | **3**<br>1.Wankum, R<br>4.McLeod, W<br>5.Holder, C<br>5.Carter, C<br>5.Collins, G<br>5.Sclar, A | **4**<br>1.Wankum, R<br>4.Kuong, A<br>5.Holder, C<br>5.Carter, C<br>5.Collins, G<br>5.Sclar, A | **5**<br>1.Wankum, R<br>4.Kuong, A |
| **6**<br>1.Wankum, R<br>4.Kuong, A | **7**<br>1.Pham, M<br>4.McLeod, W<br>5.Holder, C<br>5.Carter, C<br>5.Collins, G<br>5.Sclar, A | **8**<br>1.Pham, M<br>4.McLeod, W<br>5.Holder, C<br>5.Carter, C<br>5.Collins, G<br>5.Sclar, A | **9**<br>1.Wankum, R<br>4.McCormick, J<br>5.Holder, C<br>5.Carter, C<br>5.Collins, G<br>5.Sclar, A | **10**<br>1.Wankum, R<br>4.Kuong, A<br>5.Holder, C<br>5.Carter, C<br>5.Collins, G<br>5.Sclar, A | **11**<br>1.Pham, M<br>4.Kuong, A<br>5.Holder, C<br>5.Carter, C<br>5.Collins, G<br>5.Sclar, A | **12**<br>1.Wankum, R<br>4.McLeod, W |
| **13**<br>1.Wankum, R<br>4.McLeod, W | **14**<br>1.Wankum, R<br>4.McLeod, W<br>5.Holder, C<br>5.Carter, C<br>5.Collins, G<br>5.Sclar, A | **15**<br>1.Viscardi, D<br>4.McLeod, W<br>5.Holder, C<br>5.Carter, C<br>5.Collins, G<br>5.Sclar, A | **16**<br>1.Viscardi, D<br>4.Kuong, A<br>5.Holder, C<br>5.Carter, C<br>5.Collins, G<br>5.Sclar, A | **17**<br>1.Viscardi, D<br>4.McCormick, J<br>5.Holder, C<br>5.Carter, C<br>5.Collins, G<br>5.Sclar, A | **18**<br>1.Viscardi, D<br>4.Kuong, A<br>5.Holder, C<br>5.Carter, C<br>5.Collins, G<br>5.Sclar, A | **19**<br>1.Webb, J<br>4.Kuong, A |
| **20**<br>1.Webb, J<br>4.Kuong, A | **21**<br>1.Viscardi, D<br>4.McCormick, J<br>5.Holder, C<br>5.Carter, C<br>5.Collins, G<br>5.Sclar, A | **22**<br>1.Viscardi, D<br>4.McCormick, J<br>5.Holder, C<br>5.Carter, C<br>5.Collins, G<br>5.Sclar, A | **23**<br>1.Webb, J<br>4.Kuong, A<br>5.Holder, C<br>5.Carter, C<br>5.Collins, G<br>5.Sclar, A | **24**<br>1.Webb, J<br>4.Kuong, A<br>5.Holder, C<br>5.Carter, C<br>5.Collins, G<br>5.Sclar, A | **25**<br>1.Webb, J<br>4.Kuong, A<br>5.Holder, C<br>5.Carter, C<br>5.Collins, G<br>5.Sclar, A | **26**<br>1.Viscardi, D<br>4.Bekic, M |
| **27**<br>1.Viscardi, D<br>4.Bekic, M | **28**<br>1.Webb, J<br>4.Kuong, A<br>5.Holder, C<br>5.Carter, C<br>5.Collins, G<br>5.Sclar, A | **29**<br>1.Viscardi, D<br>4.Kuong, A<br>5.Holder, C<br>5.Carter, C<br>5.Collins, G<br>5.Sclar, A | | | | |

```
1:  7:00a- 7:00p    2: 11:00a-11:00p    3: 11:00a-10:00p    4:  7:00p- 7:00a
5:  8:00a- 8:00p    6:  7:00a- 4:00p    7: 11:59p- 7:00a
```

**Bethany - Attending**

**February, 2000**

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| | | 1<br>1.Boyle, T<br>2.Rosier, T | 2<br>1.Boyle, T<br>2.Rosier, T | 3<br>1.Jeser, M<br>2.Brown, K | 4<br>1.Jeser, M<br>2.Brown, K | 5<br>1.Boyle, T<br>2.Rosier, T |
| 6<br>1.Jeser, M<br>2.Rosier, T | 7<br>1.Allegretti, P<br>2.Brown, K | 8<br>1.Boyle, T<br>2.Brown, K | 9<br>1.Allegretti, P<br>2.Rosier, T | 10<br>1.Boyle, T<br>2.Rosier, T | 11<br>1.Baker, W<br>2.Rosier, T | 12<br>1.Pham, M<br>2.Brown, K |
| 13<br>1.Pham, M<br>2.Brown, K | 14<br>1.Allegretti, P<br>2.Brown, K | 15<br>1.Jeser, M<br>2.Oland, P | 16<br>1.Allegretti, P<br>2.Ting, L | 17<br>1.Boyle, T<br>2.Oland, P | 18<br>1.Boyle, T<br>2.Oland, P | 19<br>1.Boyle, T<br>2.Oland, P |
| 20<br>1.Baker, W<br>2.Oland, P | 21<br>1.Boyle, T<br>2.Ting, L | 22<br>1.Pham, M<br>2.Ting, L | 23<br>1.Baker, W<br>2.Oland, P | 24<br>1.Boyle, T<br>2.Oland, P | 25<br>1.Boyle, T<br>2.Ting, L | 26<br>1.Baker, W<br>2.Ting, L |
| 27<br>1.Baker, W<br>2.Ting, L | 28<br>1.Jeser, M<br>2.Ting, L | 29<br>1.Baker, W<br>2.Oland, P | | | | |

1: 7:00a- 7:00p    2: 7:00p- 7:00a

TRINITY/RES

February, 2000

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|--------|--------|---------|-----------|----------|--------|----------|
| | | 1<br>2.Lang, N | 2<br>1.Kanagy, A | 3<br>1.Kanagy, A | 4<br>1.Lang, N | 5<br>1.Lang, N |
| 6<br>1.Lang, N | 7<br>1.Kanagy, A | 8<br>2.Kanagy, A | 9<br>1.Lang, N | 10<br>1.Kanagy, A | 11<br>1.Lang, N | 12<br>1.Lang, N |
| 13<br>1.Lang, N | 14<br>1.Lang, N | 15<br>2.Gear, B | 16<br>1.Gear, B | 17<br>1.Kanagy, A | 18<br>1.Kanagy, A | 19<br>1.Gear, B |
| 20<br>1.Gear, B | 21<br>1.Kanagy, A | 22<br>2.Kanagy, A | 23<br>1.Gear, B | 24<br>1.Gear, B | 25<br>1.Kanagy, A | 26<br>1.Gear, B |
| 27<br>1.Gear, B | 28<br>1.Gear, B | 29<br>2.Kanagy, A | | | | |

1: 11:00a-11:00p    2: 11:00a-10:00p

*1999-2000 EMERGENCY MEDICINE*
*RESIDENT HOURS DISTRIBUTION*

**RESIDENT:**  Brent J. Gear, DO
1020 S. Wabash, #8C
Chicago, IL 60605

**1998-99 BALANCE**

+ 4 ½
ortho +10

| Mo | # Shft Wk | # Shft Req | BH | EW | OF | PH | SBH | SMN | TH | GH | | Under Over + |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jul | 18 | 18 | | | | R 10 | A 4 (4) | | | | · | +10 ½ |
| Aug | *Toxy* | CC | | | | | | | | | | +10 ½ |
| Sep | 17 | 18 | | | | R 9 | A 5 | | | A (3) | | +6 ½ |
| Oct | 20 | 18 | | | | R 5 | A 9 | | | A (6) | | +2 ½ |
| Nov | 14 | 14 | | A 1 | R 4 | | A 6 | | | A ½ (2-½) | | — |
| Dec | 17 | 18 | | | R 2 | | A 10 | | | A 5 | | – 1 |
| Jan | | | | | | | | | | | | |
| Feb | | | | | | | | | | | | |
| Mar | | | | | | | | | | | | |
| Apr | | | | | | | | | | | | |
| May | | | | | | | | | | | | |
| Jun | | | | | | | | | | | | |

*Vac* (left margin, Nov row)

Shift Dist.doc

**EXHIBIT**

C

# EMCARE RESIDENT DIRECTORY

| Last Name | First Name | | Address | City | State | Zip Code | Home Phone | |
|---|---|---|---|---|---|---|---|---|
| Baker | Wayne | DO | 7705 Larchwood Lane | Woodridge | IL | 60517 | (630) 910-5224 | Resident, 4 - Chief |
| Bekic | Marina | DO | 8741 S. 50th Ave. | Oak Lawn | IL | 60453 | (708) 425-0365 | Resident, 4 |
| Bowers | Aranyanee | DO | 5029 W. Sunnyside Ave. | Chicago | IL | 60630 | (773) 282-2987 | Resident, 4 |
| Brown | Kevin | DO | 17732 S. Ashland Ave. | Homewood | IL | 60430 | (708) 957-7389 | Resident, 4 |
| Bushell | Douglas | DO | 985 W. Bauer Rd. | Naperville | IL | 60563 | (630) 548-0674 | Resident, 2 |
| Butvilas | Keith | DO | 1250 Ashley Lane | Addison | IL | 60101 | (630) 773-8383 | Resident, 3 |
| Caltry | John | DO | 4006 Elm Ave. | Brookfield | IL | 60513 | (708) 387-2072 | Resident, 2 |
| Carpenter | Robert | DO | 2329 Kensington Ave. | Westchester | IL | 60154 | (708) 409-2001 | Resident, 2 |
| Carter | Craig | DO | 1024 Blanchard | Downers Grove | IL | 60516 | (630) 852-4631 | Resident, 2 |
| Carter | Melissa | DO | P.O. Box 16, Main St. | Bear Lake | PA | 16402 | (814) 744-9261 | Resident, 2 |
| Chao | Maurice | DO | 40 E. 9th St., Apt. 1012 | Chicago | IL | 60605 | (312) 588-0150 | Resident, 2 |
| Choksi | Chetan | DO | 23W110 Woodcroft Dr. | Glen Ellyn | IL | 60137 | (630) 545-0725 | Resident, 2 |
| Collins | Gregory | DO | 2140 N. Lincoln Park West, 707 | Chicago | IL | 60614 | (773) 529-1671 | Resident, 2 |
| Cruz | Arnold | DO | 3817 W. Wallen | Lincolnwood | IL | 60645 | (847) 879-7884 | Resident, 2 |
| Detrana | Francesca | DO | 1719 N. Fern Ct., #2 | Chicago | IL | 60614 | (312) 951-0199 | Resident, 3 |
| Dilan | Leo | DO | 427 W. Grant Pl., Unit D | Chicago | IL | 60614 | (773) 388-2793 | Resident, 3 |
| Erisman | Allen | DO | 16015 Applewood Ln., #107 | Orland Hills | IL | 60477 | (708) 226-0861 | Resident, 2 |
| Gear | Brent | DO | 1020 S. Wabash, #6C | Chicago | IL | 60605 | (773) 939-9990 | Resident, 4 |
| Gilchrist | David | DO | 5020 S. Lakeshore Dr., #3217 | Chicago | IL | 60615 | (773) 955-0623 | Resident, 2 |
| Grinbergs | David | DO | 508 N. Quincy | Hinsdale | IL | 60521 | (630) 455-6380 | Resident, 4 |
| Hick | Paul | DO | 3721 N. Damen Ave. | Chicago | IL | 60618 | (773) 665-4923 | Resident, 2 |
| Holder | Carla | DO | 5740 S. Peoria St., 2nd Floor | Chicago | IL | 60621 | (773) 488-6319 | Resident, 2 |
| Hulsey | David | DO | 30306 Fowler Circle | Warrenville | IL | 60555 | (630) 836-0165 | Resident, 2 |
| Hussain | Anwer | DO | 10735 5th Ave. Cul-Off #301 | Countryside | IL | 60525 | (708) 352-1994 | Resident, 3 |
| Jeser | Marc | DO | 446 N. Carpenter, Unit E | Chicago | IL | 60622 | (312) 226-5797 | Resident, 4 - Chief |
| Kanagy | Scott | DO | 1625 W. Edgewater, Apt. N73 | Chicago | IL | 60660 | (773) 728-9268 | Resident, 3 |

8/21/99



EXHIBIT
A

# EMCARE RESIDENT DIRECTORY

| Knight | Joseph | DO | 8951 E. Delaware | Munster | IN | 46321 | (219) 873-3207 | Resident, 2 |
|---|---|---|---|---|---|---|---|---|
| Kuong | Allan | DO | 21 Spinning Wheel Rd., #4F | Hinsdale | IL | 60521 | (630) 325-9277 | Resident, 3 |
| Lang | Nicole | DO | 1350 N. Lake Shore Drive | Chicago | IL | 60610 | (312) 255-1485 | Resident, 4 |
| Lee | Joseph (Jody) | DO | 600 Cedar Ridge Lane, #104 | Richton Park | IL | 60471 | (708) 747-8957 | Resident, 2 |
| Lim | Lawrence | DO | 11 Brighton Lane | Oak Brook | IL | 60523 | (630) 571-4588 | Resident, 4 |
| Magdziarz | Daniel | DO | 1132 Forest Road | LaGrange Park | IL | 60526 | (708) 588-0801 | Resident, 4 |
| McCormick | Julie | DO | 1632 N. Bell Ave. | Chicago | IL | 60647 | (773) 252-4902 | Resident, 3 |
| McGhin | Daniel | DO | 15285 La Reina Real, #2C | Orland Park | IL | 60462 | (708) 460-6986 | Resident, 2 |
| McJennett | Robert | DO | 655 W. Irving Park Rd., #5309 | Chicago | IL | 60613 | (773) 477-5254 | Resident, 2 |
| McLeod | Wilton | DO | 225 W. Huron St. | Chicago | IL | 60610 | (312) 274-1863 | Resident, 3 |
| Milos | Glenn | DO | 359 Winona St. | Park Forest | IL | 60466 | (708) 748-3585 | Resident, 2 |
| Morosco | James | DO | 2654 W. Medill, Apt. 210 | Chicago | IL | 60647 | (773) 489-9359 | Resident, 3 |
| Muns | Theresa | DO | 100 Forest Pl., #902 | Oak Park | IL | 60301 | (708) 368-1123 | Resident, 4 |
| Oland | Paul | DO | 9614 W. Higgins Rd., 1G | Rosemont | IL | 60018 | (847) 825-2589 | Resident, 4 |
| Outten | Stephen | DO | 3523 Dale Drive | Crete | IL | 60417 | (708) 672-0664 | Resident, 3 |
| Pacini | John | DO | 419 E. Stone Ave. | Addison | IL | 60101 | (630) 633-5347 | Resident, 4 |
| Peters | Joseph | DO | 402 Joseph Court | Oswego | IL | 60543 | (630) 554-7839 | Resident, 4 |
| Pham | Minh | DO | 6088 N. Caldwell | Chicago | IL | 60646 | (773) 631-3345 | Resident, 4 |
| Piel | Carl | DO | 311 W. 35th, #304 | Steger | IL | 60475 | (630) 235-8276 | Resident, 3 |
| Rosier | Thomas | DO | 9330 S. Longwood Dr. | Chicago | IL | 60620 | (773) 429-1950 | Resident, 4 |
| Sclar | Andrew | DO | 2115 W. Summerdale Ave. | Chicago | IL | 60625 | (773) 506-4899 | Resident, 3 |
| Stone | Robert | DO | 220 Lincoln Oaks Drive, #1415 | Willowbrook | IL | 60514 | (708) 734-3439 | Resident, 3 |
| Thai | Tam Van | DO | 938 N. Boulevard | Oak Park | IL | 60301 | (708) 445-1865 | Resident, 5 - Chief |
| Thomas | James | DO | 1824 W. Nelson Street | Chicago | IL | 60657 | (773) 529-6904 | Resident, 3 |
| Ting | Lisa | DO | 507 W. Eugenie, #1 | Chicago | IL | 60614 | (312) 951-5101 | Resident, 4 |
| Todd | Michael | DO | 7221 W. 153rd Place | Orland Park | IL | 60462 | (708) 532-4236 | Resident, 5 |
| Tucker | Jeremy | DO | 1422 W. Irving Park Rd. | Chicago | IL | 60613 | (773) 665-8925 | Resident, 2 |

6/21/99

EXHIBIT
F

JUL 01 '99 02:17PM MESA S.C.

# EMCARE RESIDENT DIRECTORY

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Viscardi | David | DO | 1212-D S. Federal St. | Chicago | IL | 60605 | (312) 435-0207 | Resident, 3 |
| Walters | Jeannine | DO | 1205 W. Sherwin, #704 | Chicago | IL | 60626 | (773) 338-5992 | Resident, 4 |
| Wankum | Rebecca | DO | 345 W. Fullerton Pkwy, #405 | Chicago | IL | 60614 | (773) 404-1312 | Resident, 3 |
| Webb | Jennifer | DO | 28 S. Prospect Ave. | Clarendon Hills | IL | 80514 | (630) 455-6428 | Resident, 3 |
| Westfall | Michael | DO | 7422 Brookdale Dr., #107 | Darien | IL | 60561 | (630) 655-0021 | Resident, 2 |
| Wizlecki | Lara | DO | 9705 S. 53rd Ave. | Oak Lawn | IL | 60453 | (708) 422-4369 | Resident, 3 |
| Young | Victor | DO | 445 E. Ohio St., #714 | Chicago | IL | 60611 | (312) 595-0661 | Resident, 3 |

6/21/89

PATIENT LOCATION    CHIC... ILLINOIS    **75755**

**EMERGENCY SERVICES RECORD**

| | | | |
|---|---|---|---|
| TR | CC | H | |
| PATIENT NAME (LAST, FIRST, INT) | PT. PHONE # | AGE | SEX | REL | BEAT NO. |
| | <493353> | 11 | m | | |
| BROUGHT TO HOSPITAL BY | ☐ POLICE HERE | TIME NOTIFIED | BADGE NO. |
| CFD | ☐ POLICE NOTIFIED | | |

HOSPITAL NO. _32580_

PT #2

ADDRESS

CITY/STATE    M000825470 M/11Y 09/27

D.O.B.    03/13/2000

**HMO / MC**

CHIEF COMPLAINT AS STATED BY PATIENT   ® side Chest pain

| PRIORITY (CIRCLE ONE) | NURSES ASSESSMENT |
|---|---|
| I<br>II<br>**III** | wake up this a.m ~ 0200.<br>crying & chest hurting to his mother. R... ...NEEDER<br>States sore throat since Friday. Coughing since Saturday. |

Nu Prior med Hx     TRIAGE NURSE'S SIGNATURE

| TIME | TEMP | O | B/P | P | R | INT | LAST TET. | LNMP | MO | DAY | YR | VISUAL ACUITY | ☐ W. CORR | ☐ TRIAGE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0250 | 99 | H | 113/65 | 116 | 24 | RL | Nov 99 | ☐NA | | | | | ☐ W/O CORR | ☐ ED |

PATIENT MEDICATION   OTC: Benadryl 25mg (2100hrs), Tylenol 325mg (0200hrs)

ALLERGIES TO MEDICATION   NKDA

WEIGHT   80#

PROVISIONAL DX:

| LEVEL OF SERVICE (TO BE CIRCLED BY PHYSICIAN) | LEVEL 1 | LEVEL 2 | LEVEL 3 |
|---|---|---|---|

| TIME ORD. | TESTS ORDERED | TIME DONE | INT | TIME ORD | MEDICATIONS / I.V.'S / RX'S | TIME DONE | INT |
|---|---|---|---|---|---|---|---|
| | Pulse Ox RA 97% | 0255 | RL | | Rocephin 1g IVPB | 0431 g | |
| | CXR PA-Lat done g | | | | motrin 400 mg po | 0430 g | |
| | CBC, blood cx x1 | 0434 | | | | | |
| | pulse ox RA 100% | 0510 g | | | | | |

INSTRUCTIONS, PRESCRIPTIONS, AND OTHER TREATMENT

| DISCHARGE V.S. | TIME | TEMP | BP | P | R | INT | COMMENTS |
|---|---|---|---|---|---|---|---|
| | 0510 | 98·7 H | — | 57 | 16 | g | |

DX:    Pneumonia

ATTENDING PHYSICIAN'S SIGNATURE   Dean W

PRIMARY CARE PHYSICIAN    Dr Sone

ADMITTING OR REFERRED PHYSICIAN   Board of Health

CORONER NOTIFIED

FUNERAL HOME

| DISPOSITION OF PATIENT | M.D. CALLED | TIME CALLED | TIME CALL RET. |
|---|---|---|---|
| ☐ DIED IN E.D.   ☐ D.O.A.   ☐ SATISFACTORY FOR DISCHARGE | ☐ HOME   ☐ VIA SELF   ☐ RELATIVE<br>☐ POLICE   ☐ AMB   ☐ OTHER | Ped. Board of Health (on-call) | 0415 |

DATE 3/13/00   TIME 0510 H

☐ ADMITTED   Room No. _____    DATE   TIME

☐ TRANSFER TO:    ACCEPTED BY:   H

NURSE'S SIGNATURE    ADMISSION DATA   TIME ADM.<br>BED TYPE   H

**EMERGENCY SERVICE RECORD**    **MEDICAL RECORDS**

**EXHIBIT**

G

ST. BERNARD HOSPITAL

EMERGENCY DEPARTMENT

SUPPLEMENTAL RECORD

M000825470 M/11Y 09/27/

03/13/2000

ADDRESSOGRAPH32380  ER

| DATE TIME | ORDERS | PHYSICIAN AND NURSE'S NOTES |
|---|---|---|
| 3/13/ | | _illegible_ |
| 025 | | _illegible_ |
| | | _illegible_ |
| | | _illegible_ |
| | | _illegible_ |
| | | _illegible_ |
| | | _illegible_ |
| | | _illegible_ |
| | | _illegible_ |
| 0510 | T 98.7 | _illegible_ |
| | R 87 | _illegible_ |
| | P 16 | _illegible_ |
| | pulse ox R4 18 ? | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

NURSE'S SIGNATURE

PHYSICIAN'S SIGNATURE          I.D. #

© 1995-98 E.S.C. *Circle positives, check normals, backslash (\) negatives.*

**14.** St. Bernard Hospital
**EMERGENCY PHYSICIAN RECORD**
**Pediatric Illness (5)**

M000825470 M/11Y 09/27/198(
03/13/2000

TIME SEEN: 0350   ROOM: TR-6
HISTORIAN: __patient __mother __paramedic __translator

J.00000032380 ER
__Recently seen/treated by doctor _____

__Similar symptoms previously _____

## HPI
**chief complaint:** fever cough congested fussy pulling ears
vomiting diarrhea seizure ingestion

### PAST HISTORY
__ear infection(s)_____

- __bronchitis / bronchiolitis
- __pneumonia
- __asthma
- __pharyngitis
- __urinary tract infection
- __diabetes
- __febrile seizure
- __seizure disorder
- __cardiac problems

**started:** _____

__problems in-utero
__premature birth
__complications at birth
__other problems_____

### current & associated symptoms:

**GENERAL**
__fever
R O T Ax ___ to ___ °F
subjective   persistent

**HEENT**
__ear-ache / pulling at ears  R / L
__runny nose / congestion
__colored / clear drainage
__sore throat
__red eyes / discharge  R / L

**CHEST**
__cough
__post-tussive emesis  2° pain
__trouble breathing
wheezing   stridor
mild  moderate  severe

**GI**
__vomiting x  post-tussive only
billous  bloody
__diarrhea x ___
__blood in stools
__abdominal pain
general   periumbilical
RUQ  RLQ  LUQ  LLQ
migrated periumbilical to RLQ

**NEURO**
__eating differently
__fussy  crying more  inconsolable
not sleeping  decrsd activity
__headache
__seizure
generalized  focal
duration
incontinent  postictal confusion

**GU**
__drinking / eating less
__not drinking  decrsd urination
last urinated
__pain with urination

**SKIN**
__skin rash / diaper rash

**MUSCULOSKEL. & LYMPHATICS**
__extremity pain/swelling
__"lumps" or "swollen glands"

__sick contacts __home __school __other_____

__all systems neg. except as marked

Immunizations- __up-to-date

Medications- __none __see nurses note
__ASA __ibuprofen __acetaminophen
_benadryl_

Allergies __NKDA
__see nurses note

### INGESTION __substance:_____
amount:_____
time:_____
__called poison control PTA __given ipecac PTA __vomited p̄ ingestion
__lethargic __other symptoms after ingestion

### SOCIAL HX  __smoking in house (second-hand exposure)
__attends daycare / school
__caregiver

### FAMILY HX  __no significant inherited disorder

SF

☑ Nursing Assessment Reviewed.   ☑ Vital signs noted.

## PHYSICAL EXAM
- ☑ no acute distress   __mild distress   __moderate   __severe
- ☑ active   ☑ playful   __fussy  __crying  __cries on exam  __irritable
- ☑ smiles   *Resp distress*
- ☑ attentiveness nml (for age)
- ☑ good eye contact   __lethargic / weak cry_____
- __sleeping/easily aroused

**INFANTS**
- __nml consolability   __poor consolability
- __nml feeding / suck   __poor intake suck
- __flat ant. fontanel   __poor muscle tone
-   __closed / bulging / sunken  ant. fontanel__

## NEURO
- ☑ nml motor/sensory   __facial asymmetry/EOM palsy/anisocoria__
- ☑ CN's nml as tested   __sensory loss / weakness_____

## HEENT
-   __tenderness/swelling_____
- ☑ conjun. & lids nml   __scleral icterus / injected conjunctivae__
- ☑ PERRL   __conjunctival exudate_____
-   __sunken eyes_____
-   __photophobia_____
- __ears nml   __TM erythema ( R / L )_____
-   __TM dullness ( R / L )_____
-   __Loss of TM landmarks ( R / L )_____
-   __TM obscured by wax ( R / L )_____
- ☑ nose nml   __rhinorrhea_____
-   __purulent nasal drainage_____
- ☑ pharynx nml   __pharyngeal erythema_____
-   __ulcerations / vesicles_____
-   __tonsillar exudate_____
-   __drooling / trismus / mass_____
-   __dry mucous membranes_____

## NECK
-   __meningismus / Brudzinski / Kernigs___
- ☑ supple, no masses   ☑ lymphadenopathy  (R) AC nodes all < ½ cm

## CVS
- ☑ reg. rate & rhythm   __murmur  grade ___ /6  sys / dias
- ☑ heart sounds nml   __decreased cap refill / peripheral pulses___
- ☑ strong periph pulses      capillary refill- _____ sec

## RESPIRATORY
- ☑ no resp. distress   __respiratory distress_____
- __breath sounds nml   __retractions / accessory muscle use__
-   __prolonged expirations_____
-   __decr. air movement_____
-   __grunting (infants)_____
-   __stridor_____
-   __rhonchi_____
-   __wheezing_____
- ☑ rales  *crackles (R) base*

## ABDOMEN
- ☑ non-tender   __tenderness_____
- ☑ no organomegaly   __guarding_____
-   __rebound_____
-   __hepatomegaly / splenomegaly / mass____
-   __abnormal bowel sounds_____

## FEMALE GENITALIA
- ☑ nml inspection   __discharge / erythema_____

## MALE GENITALIA
- __testes descended   __scrotal swelling / tenderness_____
-   __circumcised / uncircumcised_____

## EXTREMITIES
- ☑ non-tender
- ☑ nml ROM

## SKIN
- ☑ no rash   __cyanosis / diaphoresis / pallor_____
- ☑ no petechiae   __skin rash / diaper rash_____
- ☑ normal color   urticarial  eczematous  impetiginous  varicelliform
- ☑ warm, dry,   scarlatinaform  monilial  erythematous  vesicular  crusted
- ☑ nml palpatn

MOD 282657-20  M / 11 Y   09/27/1988
03/13/2000
J Q0000000000  ER

## LABS, X-RAYS, AND PROGRESS NOTES

| CBC | Chemistries | ESR | UA |
|---|---|---|---|
| normal | normal |  | normal |
| nml except | nml except |  | nml except |
| WBC | Gluc |  | WBC's |
| Hgb | BUN |  | RBC's |
| Hct | Creat |  | bacteria |
| Platelets | Na |  | dip |
| segs | K |  |  |
| bands | Cl | **Fecal** |  |
| lymph | CO@ | **Leukocytes** | gram stain |
| monos |  | none  few |  |
| eos |  | mod.  many |  |

**Pulse Oximeter**  time 05:55  97 %   (RA)
**CXR**  __nml / NAD   *R/M infiltrate segmental*

**LP** __discussed risks, benefits, alternatives/ parent/guardian consents.
- __sitting ( R / L )   __open. press.
- __betadine prep   __fluid color   RBC ___ WBC ___
- __sterile technique   __glucose   polys ___ lymph ___
- L3/4   __protein   monos ___ gm.stn ___
- L4/5   __Bactigen panel- __neg

Time _____   __re-examined  __unchanged  __improved
__alert  __nml attentiveness for age  __nml consolability (infants)

Hx / Exam limited by __Y.1_____   __Crit Care- ___ min
- ☑ Discussed with Dr _____   __Prior records ordered
- ☑ will see patient in: (office) ED / hospital   __Additional history from:
- ☑ Counseled parents regarding   (Family) caretaker · paramedics
- ☑ lab results  ☑ diagnosis  ☑ need for follow-up   __EKG  (X-ray) examined
- ☑ Rx given  __Admit orders written   __Discussed with radiologist

## CLINICAL IMPRESSION:
| | |
|---|---|
| Fever | Meningitis / Sepsis |
| Otitis Media- acute- R / L | (Pneumonia) |
| Pharyngitis | Dehydration |
| Sinusitis | Croup- acute |
| Chicken Pox | Bronchitis / Bronchiolitis - acute |
| Viral Syrdome | Urinary Tract Infection- acute |
| Upper Respiratory Infection | Gastroenteritis / Enteritis  -acute |

DISPOSITION- ☑ home  □ admitted  □ transferred _____
CONDITION-  □ unchanged  ☑ improved  ☑ stable _____

SIGNATURE- *[signature]*

# ST. BERNARD HOSPITAL
## and Health Care Center
### SIXTY FOURTH AND DAN RYAN EXPRESSWAY
### CHICAGO, ILLINOIS 60621

**EMERGENCY DEPARTMENT**

Preliminary Radiograph Record

M000825470 M/11Y 09/27/19(

03/13/2000

J00000032380 ER
PATIENT INFORMATION STAMP

| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ CHEST PA & LAT. | ☐ CERVICAL SPINE | | RT | LT | | |
| ☐ CHEST-PEDS | ☐ THORACIC SPINE | | ☐ | ☐ RIBS | | |
| ☐ SKULL | ☐ LUMBOSACRAL SPINE | | ☐ | ☐ SHOULDER | | |
| ☐ MASTOIDS | ☐ PELVIS | | ☐ | ☐ CLAVICLE | | |
| ☐ FACIAL BONES | RT | LT | ☐ | ☐ HUMERUS | | |
| ☐ NOSE | ☐ | ☐ HIP | ☐ | ☐ ELBOW | | |
| ☐ MANDIBLE | ☐ | ☐ FEMUR | ☐ | ☐ FOREARM | | |
| ☐ SINUSES | ☐ | ☐ KNEE | ☐ | ☐ WRIST | | |
| ☐ ABDOMEN | ☐ | ☐ LEG (LOWER) | ☐ | ☐ HAND | | |
| ☐ ABDOMEN (FREE AIR SERIES) | ☐ | ☐ ANKLE | ☐ | ☐ ORBIT | | |
| ☐ NECK-SOFT TISSUE | ☐ | ☐ FOOT | | OTHER | | |
| ☐ CROSS TABLE C-SPINE | | | | | | |

PRELIMINARY
INTERPRETATION: ☐ NEGATIVE ☐ X-RAYED FOR COMPARISON

OTHER COMMENTS: *Segmental RML infiltrate*

IF READ BY EMERGENCY PHYSICIAN PLEASE SIGN: _____
SIGNATURE

RADIOLOGIST'S SIGNATURE: _____

Radiologist Review

☐ Agree

☐ Different (Please call Emergency Department or Staff Attending M.D. Immediately)

**Notification:** Date: _____ Time: _____

Who Contacted: _____ By Whom: _____

**CHART/MEDICAL RECORD**

03-897 REV. (8/81)

REFERRED TO:

**ST. BERNARD HOSPITAL and Health Care Center**
64TH AND DAN RYAN EXPRESSWAY
CHICAGO, ILLINOIS 60621
PHONE: (773) 962-3900

Dr. Kin   Dr. Jone

## EMERGENCY DEPARTMENT
## INSTRUCTIONS TO PATIENT

The examination and treatment you have received in the Emergency Department have been given on an emergency basis only and are not intended to be a substitute for or an effort to provide complete medical care. For your protection, we suggest you contact a physician of your choice for continued follow-up care, and for any further problems.

X-rays do not always show injury or disease, and fractures may not be revealed on the initial x-rays. If the problem persists or worsens additional x-rays may be required. If this should occur, you should contact a physician. Your initial x-ray reading is a preliminary interpretation. The Radiologist will make a final reading within 24 hours, and if there is any difference from the preliminary reading you will be informed.

> This sheet is evidence that you were in our emergency department today. If your employer should require any additional "Back to Work Slip," please consult your private physician or your company doctor.

### PLEASE FOLLOW THE INSTRUCTIONS BELOW AS INDICATED FOR YOU:

- ☐ Abdominal Complaint
- ☐ Asthma
- ☐ Back Strain
- ☐ Burn
- ☐ Cast Care
- ☐ Chest Pain
- ☐ Cold, Adult
- ☐ Cold, Child
- ☐ Crime Victim's Compensation
- ☐ Croup
- ☐ Crutches
- ☐ Culture & Sensitivity
- ☐ Drinking Problem
- ☐ Eye Injury
- ☐ Fever, Adult
- ☐ Fever, Child
- ☐ Head Injury, Adult
- ☐ Head Injury, Child

- ☐ Hepatitis
- ☐ High Blood Pressure
- ☐ Lice Infestation
- ☐ Neck Strain
- ☐ Nose Bleed
- ☐ Otitis Media
- ☐ Sexual Assault
- ☐ Sprain, Fracture, Bruise
- ☐ Tetanus, Diptheria Immunization
- ☐ Threatened Miscarriage
- ☐ Urinary Tract Infection
- ☐ Venereal Disease, Female
- ☐ Venereal Disease, Male
- ☐ Vomiting & Diarrhea, Adult
- ☐ Vomiting & Diarrhea, Child
- ☐ Wound Care
- ☐

Number of Stitches _____
You Received ☐   ☐ Tetanus Toxoid   ☐ Tetanus Immune Globulin

See your family physician or return to the Emergency Department for suture removal or follow up care. If you should have any problems, please seek medical attention promptly.

☑ The following Medications were prescribed for you. Take them as instructed. Sedatives or pain medications may make you drowsy, so you should not drink alcohol or operate dangerous machinery while you are taking those medicines.

ibuprofen
biaxin

☒ X-Rays were taken of the:
CXR

☒ Other Tests or Treatment:
CBC, blood culture

☑ Other Instructions:
1. Call your private physician for follow-up evaluation within 24 hours.

rest fluids
off school until cleared to
return by pediatrician
Return if new symptoms,
symptoms worse, or other problems

I understand that the emergency care which I have received is preventive care of an emergency nature. This emergency care is by no means intended to be a complete diagnosis or complete medical care. I have been instructed to contact a physician for continued medical diagnosis and care, and I will do so. I have received a copy of these instructions.

X _____
Signature of patient OR responsible person

☐ Self   ☐ Parent   ☐ Other: _____

Relationship to Patient

Patient's Name

Signature of Nursing Personnel          3/15/00   Date

SF

M000825470   M/11Y   09/27/1988

03/13/2000

J00000032380   ER

| PATIENT LOCATION | TIME IN RM | ST. BERNARD HOSPITAL | NUMBER |
| TR      CC | H | CHICAGO, ILLINOIS EMERGENCY SERVICES RECORD | 75746 |

PATIENT NAME (LAST, FIRST, INT.) — men — PT. PHONE # — AGE *mo* | SEX *mal* | REL | BEAT NO. | HOSPITAL NO. | HM

BROUGHT TO HOSPITAL BY — ☐ POLICE HERE / ☐ POLICE NOTIFIED — TIME NOTIFIED H — BADGE NO.

CHIEF COMPLAINT AS STATED BY PATIENT

mother c/o that the baby has not *000823375 H/1H* *01/19/2000*
better for 3 days

NURSES ASSESSMENT — pt c vomits and temp
of 102 rectal, crying c diaper rash
pt given pedialyte tolerating, baby crying
no tears present

CITY/STATE
03/12/2000
D.O.D.

*000003?355    ER*    **HMO / MC**

TRIAGE NURSE'S SIGNATURE

| TIME 2226 H | TEMP 102 rectal R | B/P | P 107 | R | INR | LAST TET. | LNMP MO DAY YR ☐ NA | VISUAL ACUITY R    L | ☐ W. CORR ☐ W/O CORR | ☐ TRIAGE ☐ ED |

PATIENT MEDICATION — ALLERGIES TO MEDICATION — WEIGHT 8 lb 2 oz

PROVISIONAL DX:

LEVEL OF SERVICE (TO BE CIRCLED BY PHYSICIAN) — LEVEL 1 — LEVEL 2 — LEVEL 3

| TIME ORD. | TESTS ORDERED | TIME DONE | INT | TIME ORD | MEDICATIONS / I.V.'S / RX'S | TIME DONE | INT |
|---|---|---|---|---|---|---|---|
| | CBC Chem 7 cath UA | 0035 | | | Tylenol Supp 60mg | PR 2360 | |
| | ☐ R temp | | | | rocephin 200 mg IVPB | 0040 | |
| | CSF Panel 020 g | | | | Peplite D5 0.2 NS 15 ml/hr | | |
| | blood cx 1 urine cx x 1 | 0095 | | | | 0060 | |

INSTRUCTIONS, PRESCRIPTIONS, AND OTHER TREATMENT

acute urinary tract infection

| DISCHARGE | TIME | TEMP 99.4 | BP | P | R | INT | COMMENTS |
V.S. Dehydration — sepsis

DX: febrile illness, possible sepsis / meningitis ero — ATTENDING PHYSICIAN'S SIGNATURE Sears

PRIMARY CARE PHYSICIAN  N. Sanchez — ADMITTING OR REFERRED PHYSICIAN — CORONER NOTIFIED — FUNERAL HOME

| DISPOSITION OF PATIENT | M.D. CALLED | TIME CALLED | TIME CALL RET. |
|---|---|---|---|
| ☐ DIED IN E.D.  ☐ D.O.A.  ☐ SATISFACTORY FOR DISCHARGE  ☐ HOME ☐ VIA SELF ☐ RELATIVE  ☐ POLICE ☐ AMB ☐ OTHER | Sanchez | 0215 | |
| DATE                                    TIME | Javier (came to CSF results Sr Rosalie) | 0225 | |
| ☐ ADMITTED  Room No. 717-2 | Javier | 0405 | 0410 |
| DATE      H   TIME | | | |
| ☐ TRANSFER TO: ___  ACCEPTED BY: ___ | | | |
| NURSE'S SIGNATURE | ADMISSION DATA  BED TYPE | TIME ADM. H | |

EMERGENCY SERVICE RECORD — **MEDICAL RECORDS** — 03-445 (8/98)

PRESS HARD WITH BALL POINT PEN    PHYSICIAN'S ORDERS

**ST. BERNARD HOSPITAL**
CHICAGO, ILLINOIS

DATE 3/13/00    TIME 0410

1. admit Peds Dr Porier
2. Dx febrile illness R/O sepsis
3. dehydration
4. probable urinary tract infection
5. Vitals q 4°
6. NKDA
7. diet for age as tolerated
8. IV D5 0.2 NS @ 15 cc/hr
9. rocephin 200 mg IVPB q 24°
10. tylenol supp 60 mg PR
11. CBC, Chem 7 in am

GENERIC EQUIVALENT MAY BE DISPENSED UNLESS SPECIFIED IN WRITING

DOCTOR'S SIGNATURE    Narc. Reg. No.    RN    TIME

CHART COPY

TO REMOVE PHARMACY FORM PULL FROM THIS SIDE

---

**ST. BERNARD HOSPITAL**
CHICAGO, ILLINOIS

DATE 3/13/00    TIME 0411

1. further orders per Dr Porier
2.
3.
4.
5.
6.
7.
8.
9.
10.
11.

GENERIC EQUIVALENT MAY BE DISPENSED UNLESS SPECIFIED IN WRITING

DOCTOR'S SIGNATURE    Narc. Reg. No.    RN    TIME

CHART COPY

TO REMOVE PHARMACY FORM PULL FROM THIS SIDE

---

**ST. BERNARD HOSPITAL**
CHICAGO, ILLINOIS

DATE    TIME

1.
2.
3.
4.
5.
6.
7.
8.
9.
10.
11.

GENERIC EQUIVALENT MAY BE DISPENSED UNLESS SPECIFIED IN WRITING

DOCTOR'S SIGNATURE    Narc. Reg. No.    RN    TIME

CHART COPY

TO REMOVE PHARMACY FORM PULL FROM THIS SIDE

H1

© 1995-98 E.S.C. *Circle positives, check normals, backslash (\) negatives.*

14    St. Bernard Hospital
**EMERGENCY PHYSICIAN RECORD**
Pediatric Illness    (5)

TIME SEEN: 2315    ROOM: TR2
HISTORIAN: __patient __mother __paramedic __translator

M000823375 M/1M    01/19/2000

03/12/2000

J000000323365    ER

__Recently seen/treated by doctor_____

__Similar symptoms previously_____

**HPI**
**chief complaint:** (fever) cough/congested (fussy) pulling ears
(vomiting) diarrhea seizure ingestion

**started:** Today

**PAST HISTORY**
__ear infection(s)_____
_____
_____
_____
_____
_____
__problems in-utero_____
__premature birth_____
__complications at birth_____
__other problems_____

__bronchitis / bronchiolitis
__pneumonia
__asthma
__pharyngitis
__urinary tract infection
__diabetes
__febrile seizure
__seizure disorder
__cardiac problems

**current & associated symptoms:**

**GENERAL**
(fever)
R O T Ax  to _____ °F
(subjective) persistent

**HEENT**
__ear ache / pulling at ears R/L
__runny nose / congestion_____
____colored / clear drainage
__sore throat
__red eyes / discharge R/L

**CHEST**
__cough
____post-tussive emesis
__trouble breathing_____
____wheezing stridor
____mild moderate severe

**GI**
(vomiting) x several times
__bilious bloody
__diarrhea x_____
__blood in stools_____
__abdominal pain_____
____general periumbilical
____RUQ RLQ LUQ LLQ
____migrated periumbilical to RLQ

__sick contacts __home __school __other_____

__all systems neg. except as marked_____

**NEURO**
__acting differently
__fussy crying more inconsolable
__not sleeping __decrsd activity
__headache_____
__seizure
__generalized focal
__duration_____
__incontinent postictal confusion

**GU**
__drinking / eating less
__not drinking __decrsd urination
__last urinated _____
__pain with urination

**SKIN**
__skin rash / diaper rash

**MUSCULOSKEL & LYMPHATICS**
__extremity pain/swelling
__lumps or swollen glands

Immunizations- __up-to-date _____

Medications __none __see nurses note
__ASA __ibuprofen __acetaminophen

Allergies __NKDA
__see nurses note

**INGESTION** substance:_____
amount:_____
time:_____
__called poison control PTA __given ipecac PTA __vomited p̄ ingestion
__lethargic __other symptoms after ingestion

**SOCIAL HX** __smoking in house (second-hand exposure)
__attends daycare / school
__caregiver_____

**FAMILY HX** __no significant inherited disorder

☑ Nursing Assessment Reviewed.   ☑ Vital signs noted.

## PHYSICAL EXAM
- ✓no acute distress   __mild distress   __moderate   __severe
- ✓active   _playful_   __fussy   __crying   ✓cries on exam   __irritable
- ✓smiles
- ✓attentiveness nml (for age)
- ✓good eye contact   __lethargic / weak cry
- __sleeping/easily aroused

**INFANTS**
- ✓nml consolability   __poor consolability
- ✓nml feeding / suck   __poor intake suck
- ✓flat ant. fontanel   __poor muscle tone
- __closed / bulging / sunken  ant. fontanel

## NEURO
- ✓nml motor/sensory   __facial asymmetry/EOM palsy/anisocoria
- ✓CN's nml as tested   __sensory loss / weakness

## HEENT
- __tenderness/swelling
- ✓conjun. & lids nml   __scleral icterus / injected conjunctivae
- ✓PERRL   __conjunctival exudate
- __sunken eyes
- __photophobia
- ✓ears nml   __TM erythema ( R / L )
- __TM dullness ( R / L )
- __Loss of TM landmarks ( R / L )
- __TM obscured by wax ( R / L )
- ✓nose nml   __rhinorrhea
- __purulent nasal drainage
- ✓pharynx nml   __pharyngeal erythema
- __ulcerations / vesicles
- __tonsillar exudate
- __drooling / trismus / mass
- __dry mucous membranes

_white maxillary exudate - possible thrush_

## NECK
- __supple, no masses   __meningismus / Brudzinski / Kernigs
- ✓lymphadenopathy  (R) AC adn <1 cm

## CVS
- ✓reg. rate & rhythm   __murmur  grade ___ /6  sys / dias
- ✓heart sounds nml   __decreased cap refill / peripheral pulses
- ✓strong periph pulses   _capillary refill-_ ___ sec

## RESPIRATORY
- ✓no resp. distress   __respiratory distress
- ✓breath sounds nml   __retractions / accessory muscle use
- __prolonged expirations
- __decr. air movement
- __grunting (infants)
- __stridor
- __rhonchi
- __wheezing
- __rales

## ABDOMEN
- ✓non-tender   __tenderness
- ✓no organomegaly   __guarding
- __rebound
- __hepatomegaly / splenomegaly / mass
- __abnormal bowel sounds

## FEMALE GENITALIA
- __nml inspection   __discharge / erythema

## MALE GENITALIA
- ✓testes descended   __scrotal swelling / tenderness
- circumcised / uncircumcised

Pediatric Illness-14

---

## EXTREMITIES
- ✓non-tender   _tenderness_
- ✓nml ROM

M000823375 M71M   01719720C

## SKIN
- ✓no rash
- ✓no petechiae   __poor skin turgor
- ✓normal color
- ✓warm, dry,   J skin rash Diaper  F R
-   nml palpatn   _urticarial  eczematous  impetiginous  varicelliform_
-   _scarlatinaform  monilial  erythematous  vesicular  crusted_

02/hh O2OO _____   ✓cyanosis / diaphoresis / pallor

## LABS, X-RAYS, AND PROGRESS NOTES

**CBC**  normal  nml except  10.7
- WBC  10.7    **Chemistries**  normal  nml except  1.61   **ESR**   cat
- Hgb  9.3     Gluc  1.61   **UA**  normal  nml except
- Hct  27.1    BUN  23
- Platelets  553   Creat  1.2   WBC's  8-10
- segs  60.3   Na  145   RBC's  0
- bands        K  4.8   bacteria  3+
- lymphs  22.1   Cl  105   dip:  4 granules
- monos  13.1   CO@  17   **Fecal Leukocytes**  none  few
- eos          **Pulse Oximeter**  _time_  95 %  (RA)  mod. many  gram stain
- Hgb

**CXR**  (nml) NAD

**LP**  ✓discussed risks, benefits, alternatives; parent/guardian consents
- ✓sitting / R / L   ___ open, press._ not breakthrough_
- ✓betadine prep   fluid color  _clear_   RBC  0   WBC  1
- ✓sterile technique   glucose  ___ /OR   polys  0   lymph
- 12:34  0C /131   protein  36   monos  0   gm stn
- L4.5   Bactigen panel:

_Time_   __re-examined  __unchanged  __improved
alert  ✓nml attentiveness for age   ✓nml consolability (Infants)

_Interosseous line started right tibia_
_D5D CSF results still pending_

Hx / Exam limited by ___   Crit Care- ___ min

- ✓Discussed with Dr. _Javier_   ✓Prior records ordered
- ✓will see patient in  office / ED / (hospital)   Additional history from:
- ✓Counseled parents regarding:   (family) caretaker  paramedics
- ✓lab results  diagnosis  need for follow-up
- (EKG) (X-ray) examined
- Rx given  ✓Admit orders written   ✓Discussed with radiologist

## CLINICAL IMPRESSION:
- Fever   Meningitis / Sepsis
- Otitis Media- acute-  R / L   Pneumonia
- Pharyngitis   (Dehydration)
- Sinusitis   Croup- acute
- Chicken Pox   Bronchitis / Bronchiolitis - acute
- Viral Sydrome   (Urinary Tract Infection- acute)
- Upper Respiratory Infection   Gastroenteritis / Enteritis -acute

_febrile illness possible sepsis_

**DISPOSITION-**  ☐home ☑admitted ☐transferred
**CONDITION-**  ☐ unchanged ☑improved ☑stable

**SIGNATURE-** _[signature]_

ST. BERNARD HOSPITAL

EMERGENCY DEPARTMENT

SUPPLEMENTAL RECORD

M000823375 M/1M    01/19/200(

03/12/2000

ADDRESSOGRAPH

J00000032365   ER

| DATE TIME | ORDERS | PHYSICIAN AND NURSE'S NOTES |
|---|---|---|
| 0210 | Temp 101.3° F initially | pt in alleg. Oxygen cont-tbl. hypordinn rubbed. pt good cap refill wnl. pulse ox rm 96%. Offer |
| | | pt didn't g given. |
| OVR | | another f the g put lft gm pt floated well fld. gm saline pt |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

_____    NURSE'S SIGNATURE

_____
PHYSICIAN'S SIGNATURE    _____    I.D. #

ST. BERNARD HOSPITAL

EMERGENCY DEPARTMENT

SUPPLEMENTAL RECORD

M000823375 M/1M 01/19/200

03/12/2000

ADDRESSOGRAPH

J00000032365 ER

| DATE TIME | ORDERS | PHYSICIAN AND NURSE'S NOTES |
|---|---|---|
| 3/11/0 | | _[handwritten, illegible]_ |
| 2224 | | _[handwritten, illegible]_ |
| | 2300 | _[handwritten, illegible]_ |
| | | _[handwritten, illegible]_ |
| | | _[handwritten, illegible]_ |
| | | _[handwritten, illegible]_ |
| | | _[handwritten, illegible]_ |
| | | _[handwritten, illegible]_ |
| | - | _[handwritten, illegible]_ |
| | 0060 | _[handwritten, illegible]_ |
| | | _[handwritten, illegible]_ |
| | | _[handwritten, illegible]_ |
| | - | _[handwritten, illegible]_ |
| | | _[handwritten, illegible]_ |
| | 0050 | _[handwritten, illegible]_ |
| | | _[handwritten, illegible]_ |
| | - | _[handwritten, illegible]_ |
| | | _[handwritten, illegible]_ |
| | 0230 | _[handwritten, illegible]_ |
| | | _[handwritten, illegible]_ |
| | | |

_____  NURSE'S SIGNATURE

_____ PHYSICIAN'S SIGNATURE _____ I.D. #

03-1073

ST. BERNARD HOSPITAL
CHICAGO, ILLINOIS

CONSENT TO OPERATE

PATIENT _____  RM. NO. *TR2*  AGE *7 wks*  DATE *3/12/00*

PHYSICIAN *Gear*  TIME ____ A.M. *2325* (P.M.)

1. I hereby authorized Doctor(s) *Gear* ____ Surgeon(s) and whomever he may designate as his assistants, to perform upon *Demarcus Lindsey (myson)* the following operation _____

   *lumbar puncture to collect spinal fluid to check for meningitis*

   and if any unforseen condition arises in the course of the operation calling, in his judgment, for procedures, in addition to, or different from, those now contemplated, I further request and authorize him to do whatever he deems advisable.

2. The nature and purpose of the operation, possible alternative methods of treatment, the risk involved, and the possibility of complications, have been fully explained to me. I acknowledge that no guarantee or assurance has been made to the results that may be obtained.

3. I consent to the administration of anesthesia or to the use of such anesthetics as may be deemed advisable.

4. I am aware that sterility may result from this operation though such a result has not been guaranteed. I know that a sterile person is incapable of parenthood.

5. I consent to the disposal, by authorities of St. Bernard Hospital of any tissue or parts which may be removed.

6. I consent to the taking and the publications of photographs in the course of this operation for the purpose of advancing medical education.

7. I certify that I have read and fully understand the above consent to operate, that the explanations therein mentioned were made, and that all blanks or statements requiring insertion or completion, were filled in and **INAPPLICABLE PARAGRAPHS, IF ANY, WERE STRICKEN BEFORE I SIGNED.**

Signature of Patient_____

When patient is a minor or incompetent to give consent, signature of person authorized to consent for patient: X *Dorly Stidham*

Relationship to patient: *father* *mother*

Witness: _____

NOTE: This is a general form of consent which will be applicable on various surgical cases by striking out the portions which are inapplicable.

*I personally explained procedure, risks, & benefits*

# ST. BERNARD HOSPITAL
## and Health Care Center
### SIXTY FOURTH AND DAN RYAN EXPRESSWAY
### CHICAGO, ILLINOIS 60621

**EMERGENCY DEPARTMENT**

Preliminary Radiograph Record

M000823375 M/1M    01/19/2000

03/12/2000

J00000032365  ER

PATIENT INFORMATION STAMP

| | | RT | LT | |
|---|---|---|---|---|
| ☑ CHEST PA & LAT. | ☐ CERVICAL SPINE | | | |
| ☐ CHEST-PEDS | ☐ THORACIC SPINE | ☐ | ☐ | RIBS |
| ☐ SKULL | ☐ LUMBOSACRAL SPINE | ☐ | ☐ | SHOULDER |
| ☐ MASTOIDS | ☐ PELVIS | ☐ | ☐ | CLAVICLE |
| ☐ FACIAL BONES | RT     LT | ☐ | ☐ | HUMERUS |
| ☐ NOSE | ☐     ☐ HIP | ☐ | ☐ | ELBOW |
| ☐ MANDIBLE | ☐     ☐ FEMUR | ☐ | ☐ | FOREARM |
| ☐ SINUSES | ☐     ☐ KNEE | ☐ | ☐ | WRIST |
| ☐ ABDOMEN | ☐     ☐ LEG (LOWER) | ☐ | ☐ | HAND |
| ☐ ABDOMEN (FREE AIR SERIES) | ☐     ☐ ANKLE | ☐ | ☐ ORBIT | |
| ☐ NECK-SOFT TISSUE | ☐     ☐ FOOT | | OTHER | |
| ☐ CROSS TABLE C-SPINE | | | | |

PRELIMINARY
INTERPRETATION:        ☐ NEGATIVE        ☐ X-RAYED FOR COMPARISON

OTHER COMMENTS:

IF READ BY EMERGENCY PHYSICIAN PLEASE SIGN: _____

SIGNATURE

RADIOLOGIST'S SIGNATURE: _____

### Radiologist Review

☐ Agree

☐ Different (Please call Emergency Department or Staff Attending M.D. Immediately)

Notification: Date: _____  Time: _____

Who Contacted: _____  By Whom: _____

```
RUN DATE: 03/13/00              St. Bernard Hospital LAB **LIVE**              PAGE 1
RUN TIME: 0159                      Laboratory Report
```

| PATIENT: | ACCT #: J00000032365 LOC: ER | U #: M000823375 |
| | AGE/SX: 1M 24D/M   ROOM: | REG: 03/12/00 |
| REG DR: BAJO,JAMES | STATUS: REG ER   BED: | DIS: |

0312:U00031S COMP, Coll: 03/12/00-0030 Recd: 03/13/00-0122 (R#00077955) BAJO,JAMES

| Test | Low | Normal | High | Flag Reference |
|------|-----|--------|------|----------------|
| | | **URINALYSIS** | | |
| *MACROSCOPIC, URINE* | | | | |
| COLOR URINE | | YELLOW | | YELLOW |
| APPEARANCE | | CLOUDY | | CLEAR |
| GLUCOSE | | NEGATIVE | | NEGATIVE mg/dL |
| BILIRUBIN | | NEGATIVE | | NEGATIVE mg/dL |
| KETONE | | TRACE | | NEGATIVE mg/dL |
| SPECIFIC GRAVITY | | 1.025 | | 1.005-1.030 mg/dL |
| BLOOD IN URINE | | NEGATIVE | | NEGATIVE mg/dL |
| PH | | 6.0 | | 5.0-9.0 mg/dL |
| PROTEIN | | 100 | | NEGATIVE mg/dL |
| UROBILINOGEN | | 0.2 | | 0.2-1.5 E.U./dL |
| NITRATE | | NEGATIVE | | NEGATIVE /mg/dL |
| LEUKOCYTE ESTERASE | | NEGATIVE | | NEGATIVE mg/dL |
| *MICROSCOPIC, URINE* | | | | |
| > SQUAMOUS CELLS | | FEW | | /LPF |
| > RBC | | 0 | | /hpf |
| > WBC | | 3-4 | | /hpf |
| > BACTERIA | | 3+ | | /hpf |
| > AMORPHOUS SEDIMENT | | 4+ | | /hpf |

** END OF REPORT **

```
RUN DATE: 03/13/00              St. Bernard Hospital LAB **LIVE**                    PAGE 1
RUN TIME: 0159                       Laboratory Report
```

| | | |
|---|---|---|
| PATIENT: | ACCT #: J0000003236S LOC: ER | U #: M000823375 |
| | AGE/SX: 1M 24D/M   ROOM: | REG: 03/12/00 |
| REG DR: BAJO,JAMES | STATUS: REG ER   BED: | DIS: |

```
0312:U00031S COMP, Coll: 03/12/00-0030 Recd: 03/13/00-0122 (R#00077955) BAJO,JAMES
```

| Test | Low | Normal | High | Flag Reference |
|---|---|---|---|---|

### URINALYSIS

| | Low | Normal | High | Flag Reference |
|---|---|---|---|---|
| *MACROSCOPIC, URINE* | | | | |
| COLOR URINE | | YELLOW | | YELLOW |
| APPEARANCE | | CLOUDY | | CLEAR |
| GLUCOSE | | NEGATIVE | | NEGATIVE mg/dL |
| BILIRUBIN | | NEGATIVE | | NEGATIVE mg/dL |
| KETONE | | TRACE | | NEGATIVE mg/dL |
| SPECIFIC GRAVITY | | 1.025 | | 1.005-1.030 mg/dL |
| BLOOD IN URINE | | NEGATIVE | | NEGATIVE mg/dL |
| PH | | 6.0 | | 5.0-9.0 mg/dL |
| PROTEIN | | 100 | | NEGATIVE mg/dL |
| UROBILINOGEN | | 0.2 | | 0.2-1.5 E.U./dL |
| NITRATE | | NEGATIVE | | NEGATIVE /mg/dL |
| LEUKOCYTE ESTERASE | | NEGATIVE | | NEGATIVE mg/dL |
| *MICROSCOPIC, URINE* | | | | |
| > SQUAMOUS CELLS | | FEW | | /LPF |
| > RBC | | 0 | | /hpf |
| > WBC | | 3-4 | | /hpf |
| > BACTERIA | | 3+ | | /hpf |
| > AMORPHOUS SEDIMENT | | 4+ | | /hpf |

```
                        ** END OF REPORT **
```

```
RUN DATE: 03/13/00          St. Bernard Hospital LAB **LIVE**          PAGE 1
RUN TIME: 0116                   Laboratory Report

PATIENT:                    ACCT #: J00000032365  LOC:  ER      U #: M000823375
                            AGE/SX: 1M 24D/M       ROOM:         REG: 03/12/00
REG DR:  BAJO,JAMES         STATUS: REG ER         BED:          DIS:

0312:H00063S COMP, Coll: 03/12/00-0040 Recd: 03/13/00-0049 (R#00077955) BAJO,JAMES
```

| Test | Low | Normal | High | Flag | Reference |
|------|-----|--------|------|------|-----------|
| **HEMATOLOGY** | | | | | |
| > WBC | | 10.7 | | | 4.8-10.8 K/MM3 |
| > RBC | 2.97 | | | L | 4.70-6.10 M/mm3 |
| *HEMOGLOBIN & HEMATOCRIT* | | | | | |
| >   HEMOGLOBIN | 9.3 | | | L | 14.0-18.0 gm/L |
| >   HEMATOCRIT | 27.1 | | | L | 42.0-52.0 % |
| > MCV | | 91.4 | | | 80.0-94.0 fl |
| > MCH | | | 31.3 | H | 27.0-31.0 pg |
| > MCHC | | 34.3 | | | 33.0-37.0 g/dl |
| > RDW | | | 14.8 | | 11.5-14.5 % |
| > PLATELET COUNT | 53.0 | | | #*L | 130.0-400.0 K/mm3 |
| > MPV | | | 14.1 | H | 7.4-10.4 fl |
| > NEUTROPHILS | | 60.3 | | | 42.2-75.2 % |
| > LYMPHOCYTE | | 22.7 | | | 20.5-51.1 % |
| > MONOCYTES | | | 13.1 | *H | 1.7-9.3 % |
| > EOSINOPHIL | | 1.2 | | | 0.0-7.0 % |
| > BASOPHIL | | | 2.7 | H | 0.0-2.5 % |

** END OF REPORT **

```
RUN DATE: 03/13/00              St. Bernard Hospital LAB **LIVE**              PAGE 1
RUN TIME: 0159                       Laboratory Report
```

| | |
|---|---|
| PATIENT: | ACCT #: I00000032365 LOC: ER    U #: M000823375 |
| | AGE/SX: 1M 24D/M   ROOM:    REG: 03/12/00 |
| REG DR: BAJO,JAMES | STATUS: REG ER    BED:    DIS: |

0312:U00031S COMP, Coll: 03/12/00-0030 Recd: 03/13/00-0122 (R#00077955) BAJO,JAMES

| Test | Low | Normal | High | Flag Reference |
|------|-----|--------|------|----------------|
| | | **URINALYSIS** | | |
| *MACROSCOPIC, URINE* | | | | |
| COLOR URINE | | YELLOW | | YELLOW |
| APPEARANCE | | CLOUDY | | CLEAR |
| GLUCOSE | | NEGATIVE | | NEGATIVE mg/dL |
| BILIRUBIN | | NEGATIVE | | NEGATIVE mg/dL |
| KETONE | | TRACE | | NEGATIVE mg/dL |
| SPECIFIC GRAVITY | | 1.025 | | 1.005-1.030 mg/dL |
| BLOOD IN URINE | | NEGATIVE | | NEGATIVE mg/dL |
| PH | | 6.0 | | 5.0-9.0 mg/dL |
| PROTEIN | | 100 | | NEGATIVE mg/dL |
| UROBILINOGEN | | 0.2 | | 0.2-1.5 E.U./dL |
| NITRATE | | NEGATIVE | | NEGATIVE /mg/dL |
| LEUKOCYTE ESTERASE | | NEGATIVE | | NEGATIVE mg/dL |
| *MICROSCOPIC, URINE* | | | | |
| > SQUAMOUS CELLS | | FEW | | /LPF |
| > RBC | | 0 | | /hpf |
| > WBC | | 3-4 | | /hpf |
| > BACTERIA | | 3+ | | /hpf |
| > AMORPHOUS SEDIMENT | | 4+ | | /hpf |

**** END OF REPORT ****

```
RUN DATE: 03/13/00                 St. Bernard Hospital LAB **LIVE**                    PAGE 1
RUN TIME: 0145                           Laboratory Report

PATIENT:                           ACCT #: J00000032365 LOC: ER          U #: M000823375
                                   AGE/SX: 1M 24D/M      ROOM:           REG: 03/12/00
REG DR: BAJO,JAMES                 STATUS: REG ER        BED:            DIS:

0312:C00115S COMP, Coll: 03/12/00-2332 Recd: 03/13/00-0144 (R#00077955) BAJO,JAMES
```

| Test | Low | Normal | High | Flag | Reference |
|------|-----|--------|------|------|-----------|
| **CHEMISTRY** | | | | | |
| *BASIC METABOLIC PANEL (CHEM7)* | | | | | |
| > GLUCOSE | | 101 | | | 70-110 MG/DL |
| > BUN | | | 23 | H | 8-20 MG/DL |
| > CREATININE | | 1.2 | | | 0.7-1.6 MG/DL |
| > SODIUM LEVEL | | 145 | | | 135-148 MMOL/L |
| > POTASSIUM LEVEL | | 4.8 | | | 3.5-5.3 MMOL/L |
| > CHLORIDE LEVEL | | | 115 | H | 91-110 MMOL/L |
| > CARBON DIOXIDE LEVEL | 10 | | | L | 21-30 MMOL/L |

** END OF REPORT **

```
RUN DATE: 03/13/00            St. Bernard Hospital LAB **LIVE**              PAGE 1
RUN TIME: 0319                     Laboratory Report

PATIENT:                       ACCT #: J00000032365 LOC:  ER       U #: M000823375
                               AGE/SX: 1M 24D/M     ROOM:          REG: 03/12/00
REG DR:  BAJO,JAMES            STATUS: REG ER       BED:           DIS:

0312:R00005S COMP, Coll: 03/12/00-2332 Recd: 03/13/00-0249 (R#00077955) BAJO,JAMES

  Test              Low         Normal        High      Flag Reference
```

|                     |      | HEMATOLOGY |      |            |
| CSF CELL COUNT ONLY |      |            |      |            |
| > COLOR             |      | COLORLESS  |      | COLORLESS  |
| > APPEARANCE        |      | CLEAR      |      | CLEAR      |
| > CRENATED RBC      |      | 4CC        |      | %          |
| > WBC               |      | 1          |      | 0-5 /uL    |
| > RBC               |      | 0          |      | /mm3       |
| > NEUTROPHILS       |      | 0.0        |      | %          |
| > LYMPHOCYTES       |      | 0.0        |      | %          |
| > MONOCYTES         |      | 0.0        |      | %          |

** END OF REPORT **